**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Mindee J. Reuben
Steven J. Greenfogel
1515 Market Street - Suite 1200
Philadelphia, PA 19102
Tel: (267) 519-8306
Fax: (973) 623-0858
mreuben@litedepalma.com
sgreenfogel@litedepalma.com

*Interim Liaison Counsel for Producer Indirect Purchaser Plaintiffs*
*(Additional Counsel on Signature Page)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: FRAGRANCE INDIRECT PURCHASER ANTITRUST LITIGATION | Civil Action No.: 23-3249 (WJM)(JSA)<br><br>**PRODUCER INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Producer Indirect Purchaser Plaintiffs ("Plaintiffs")[1], individually and on behalf of all others similarly situated ("Classes" or "Class Members"), file this

---

[1] "Plaintiffs" refers collectively to each of the named plaintiffs identified in Section II.A of this complaint.

1

981296.1

Consolidated Class Action Complaint ("Consolidated Complaint") against Defendants DSM-Firmenich AG, Firmenich International, SA, Firmenich SA, Firmenich Incorporated, Agilex Flavors & Fragrance, Inc. (collectively, "Firmenich"); Givaudan SA, Givaudan Fragrances Corporation, Ungerer & Company, Inc., Custom Essence LLC (collectively, "Givaudan"); Symrise AG, Symrise Inc., and Symrise US LLC (collectively, "Symrise"); and International Flavors & Fragrances, Inc. ("IFF") (collectively, "Defendants"). Plaintiffs and the Classes seek injunctive relief, treble damages, costs, attorneys' fees, and other just relief for Defendants' *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3), state antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment laws of the several States and District of Columbia. The following allegations are based on personal knowledge as to Plaintiffs' own conduct and on the investigation conducted by their counsel as to all other allegations. Plaintiffs demand a trial by jury.

## I.   <u>INTRODUCTION</u>

1.   Plaintiffs bring this class action alleging that Defendants participated in a conspiracy to fix, raise, maintain, and stabilize the prices for "Fragrances" and "Fragrance Ingredients" as defined below, sold in the United States from January 1, 2018 until the effects of the conspiracy ceased ("Class Period"). Plaintiffs and Class

Members are entities that produce finished goods containing Fragrances, such as candles and soaps ("Finished Fragrance Products").[2]

2.      "Fragrances" are chemical mixtures that produce a distinctive scent. They are made up of "Fragrance Ingredients," which are chemical compounds such as vanillin, citral, or terpenoids.[3]  References to "Fragrances" herein shall, therefore, also include "Fragrances Ingredients" unless otherwise specified.

3.      Fragrances are added to goods to make them more appealing to the user. Because scent is an extremely important driver of sales, they can be used to establish customer preference or even establish an individual signature scent. Fragrances are therefore a fixed input for many goods.

4.      Defendants are the four largest producers of Fragrances, controlling nearly two-thirds of the global and U.S. markets. Defendants acquire raw materials and convert them into Fragrances. Defendants' sale of Fragrances and Fragrance Ingredients is a multi-billion-dollar business in the United States.

---

[2] "Finished Fragrance Product" as used herein means finished products, such as candles, soaps, perfumes, and deodorants. A Finished Fragrance Product is not intended to be used in the production of another product.

[3] The International Fragrance Association ("IFRA") maintains a "Transparency List" to catalogue each Fragrance Ingredient by its chemical name and formula. As of 2022, the IRFA Transparency list includes 3,224 Fragrance Ingredients. *See The IFRA Transparency List*, IFRA, https://ifrafragrance.org/priorities/ingredients/ifra-transparency-list (last accessed Feb. 4, 2024).

5.      Faced with rising ingredient costs, and beginning at least as early as January 1, 2018, Defendants entered into an unlawful agreement in restraint of trade to increase Fragrance prices. To maintain their profitability, Defendants coordinated their pricing policies with one another, divided the market by allocating certain customers to certain Defendants, and imposed supply constraints for Fragrances. Through this unlawful coordination, Defendants charged their customers supracompetitive prices, which were in turn passed through to Plaintiffs and the Class Members. Tellingly, however, after raw material prices began to subside, Defendants continued to increase the prices of Fragrances in a coordinated fashion.

6.      Plaintiffs learned of Defendants conspiracy no earlier than March 7, 2023.  On that date, the European Commission ("EC") announced that it had carried out dawn raids at several suppliers and an industry association in the Fragrances industry in coordination with the Swiss Competition Commission ("COMCO"), the U.S. Department of Justice Antitrust Division ("DOJ"), and the U.K. Competition and Markets Authority ("CMA").[4]

7.      The same day, CMA provided further insight into the dawn raids, announcing that it "has reason to suspect anti-competitive behaviour [*sic*] has taken place involving suppliers of Fragrance Products for use in the manufacture of

---

[4] *Antitrust: Commission Confirms Unannounced Inspections in the Fragrance Sector*, EUROPEAN COMMISSION (Mar. 7, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_1532.

consumer products such as household and personal care products," and named Firmenich International SA, Givaudan SA, International Flavors & Fragrances Inc., and Symrise AG as the subjects of the investigation.[5]

8.    The next day, COMCO revealed that the dawn raids were based on "indications that several undertakings active in the production of fragrances have violated cartel law."[6] COMCO identified the same Defendants as targets of the dawn raids and disclosed that "[t]here are suspicions that these undertakings have coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of certain fragrances."[7]

9.    In a May 10, 2023 filing with the U.S. Securities and Exchange Commission ("SEC"), IFF acknowledged the investigation and disclosed that it had received a criminal grand jury subpoena from the DOJ,[8] meaning the DOJ is considering a criminal prosecution against IFF and/or its co-conspirators. According to Section F.1 of Chapter 3 of the 2014 edition of the DOJ's Antitrust Division

---

[5] *CMA Launches Investigation into Fragrances and Fragrances Ingredients*, CMA (last updated Mar. 8, 2023), https://www.gov.uk/government/news/cma-launches-investigation-into-fragrances-and-fragrance-ingredients.

[6] *COMCO Investigates Possible Collusions in the Fragrance Market*, COMCO (Mar. 8, 2023), https://www.weko.admin.ch/weko/en/home/medien/press-releases/nsb-news.msg-id-93502.html.

[7] *Id.*

[8] International Flavors & Fragrances Inc., Quarterly Report (Form 10-Q) (May 10, 2023).

Manual, "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Similarly, Firmenich also disclosed that it received a subpoena from the DOJ.[9]

10.     On January 17, 2024, CMA revealed that it had extended its probe of Givaudan, Firmenich, and IFF to include allegations that they engaged in further anticompetitive behavior in the form of so-called no-poach agreements. Specifically, CMA stated that the companies may have engaged in unlawful coordination involving reciprocal arrangements relating to the hiring or recruitment of certain staff involved in the supply of Fragrances.[10]

11.     Defendants' conduct constitutes a horizontal conspiracy in restraint of trade—a *per se* violation of Sections 1 and 3 of the Sherman Act, as well as a violation of state antitrust laws, consumer protection laws, and unjust enrichment common laws of the several states.

12.     As a direct result of Defendants' conspiracy, Plaintiffs and Class Members purchased Fragrances or Fragrance Ingredients at artificially inflated

---

[9] *Financial Statements 2023*, Firmenich 48 (June 30, 2023), https://www.dsm-firmenich.com/content/dam/dsm-firmenich/corporate/documents/firmenich-sa-annual-report-fy2023.pdf.

[10] *Suspected Anti-competitive Conduct in Relation to Fragrances and Fragrance Ingredients (51257)*, CMA (Jan. 17, 2024), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-fragrances-and-fragrance-ingredients-51257.

981296.1

prices and were thereby injured.  Plaintiffs bring this action on behalf of themselves and a Class of all persons or entities who purchased Fragrances or Fragrance Ingredients other than directly from Defendants or alleged co-conspirators for incorporation in a Finished Fragrance Product, in the United States during the Class Period.

## II.    PARTIES

### A.    Plaintiffs

13.     Plaintiff Alexia Dahmes d/b/a Alexia Viola Napa Valley ("Alexia Viola") is a retailer that produces and sells artisan designed candles and home fragrances, in addition to other products, located in Calistoga, California. Alexia Viola is a citizen of the State of California. During the Class Period, Alexia Viola purchased Fragrances and/or Fragrance Ingredients, which she used to produce Finished Fragrance Products. Alexia Viola purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

14.     Plaintiff Ambient Glow Candles LLC ("Ambient Glow Candles") is a retailer that produces and sells artisan designed candles, located in Crestview, Florida. Ambient Glow Candles is a limited liability company with at least one member who is a citizen of the State of Florida. During the Class Period, Ambient

981296.1

Glow Candles purchased Fragrances and/or Fragrance Ingredients, which it used to produced Finished Fragrance Products. Ambient Glow Candles purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

15.    Plaintiff Buckboard, LLC d/b/a Buckboard Antiques ("Buckboard") is a retailer that produces and sells artisan designed candles, in addition to other products, located in Caledonia, Minnesota. Buckboard is a limited liability company with at least one member who is a citizen of the State of Minnesota. During the Class Period, Buckboard purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Buckboard purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

16.    Plaintiff Chautauqua Soap Company ("Chautauqua Soap") is a retailer that produces and sells artisan designed soaps, located in Jamestown, New York. Chautauqua Soap purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Chautauqua Soap purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a

supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

17.    Plaintiff Danielle Clay is a retailer that produces and sells artisan designed home fragrances, located in Harvey, Illinois. Ms. Clay is a citizen of the State of Illinois. During the Class Period, Ms. Clay purchased Fragrances and/or Fragrance Ingredients, which she used to produce Finished Fragrance Products. Ms. Clay purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

18.    Plaintiff Claudia Akers d/b/a Copper Soap Works ("Copper Soap Works") is a retailer that produces and sells artisan designed soaps and candles, located in Copperopolis, California. Copper Soap Works is a citizen of the State of California. During the Class Period, Copper Soap Works purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Copper Soap Works purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

19.    Plaintiff Handmade Natural Beauty, LLC ("Handmade Natural Beauty") is a retailer that produces and sells artisan designed bath and body products,

981296.1

located in La Crosse, Wisconsin. Handmade Natural Beauty is an LLC with a registered agent office in the State of Wisconsin. During the Class Period, Handmade Natural Beauty purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Handmade Natural Beauty purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as material, direct, and proximate result of Defendants' anticompetitive conduct.

20.    Plaintiff Janine Jenzano is a retailer that produces artisan designed scented wax melts, located in Chapel Hill, North Carolina. Ms. Jenzano is a citizen of the State of North Carolina. During the Class Period, Ms. Jenzano purchased Fragrances and/or Fragrance Ingredients, which she used to produce Finished Fragrance Products. Ms. Jenzano purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

21.    Plaintiff Lacey R. Harris d/b/a Lacey Harris Candle Co. ("Lacey Harris Candle Co.") is a retailer that produces artisan designed candles, located in Grenada, Mississippi. Lacey Harris Candle Co. is a citizen of the State of Mississippi. During the Class Period, Lacey Harris Candle Co. purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Lacey Harris

10

981296.1

Candle Co. purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

22.    Plaintiff Smelly Melly Soaps & Candles, LLC ("Smelly Melly Soaps & Candles") is a retailer that produces and sells artisan designed candles and soaps, located in Chicago, Illinois. Smelly Melly Soaps & Candles is a limited liability company with at least one member who is a citizen of the State of Illinois. During the Class Period, Smelly Melly Soaps & Candles purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Smelly Melly Soaps & Candles purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

23.    Plaintiff Shannon Brown d/b/a Pipit & Finch ("Pipit & Finch") is a retailer that produces and sells artisan designed soaps and candles, located in Reno, Nevada. Pipit & Finch is a citizen of the State of Nevada.  During the Class Period, Pipit & Finch purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Pipit & Finch purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive

price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

24.    Plaintiff Sassy Rituals LLC ("Sassy Rituals") is a retailer that produces and sells artisan designed candles, located in Boca Raton, Florida. Sassy Rituals is a limited liability company with at least one member who is a citizen of the State of Florida. During the Class Period, Sassy Rituals purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Sassy Rituals purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

25.    Plaintiff Carol Morgan d/b/a Scents of Home ("Scents of Home") is a retailer that produces and sells scented home products, located in Battle Creek, Michigan. Scents of Home is a citizen of the State of Michigan. During the Class Period, Scents of Home purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Scents of Home purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

26.    Plaintiff Maaike Fettah d/b/a Sunshine Alchemists & Soap Co. ("Sunshine Alchemists & Soap Co.") is a retailer that produces and sells artisan

981296.1

designed soaps and candles, located in Albuquerque, New Mexico. Sunshine Alchemists & Soap Co. is a citizen of the State of New Mexico. During the Class Period, Sunshine Alchemists & Soap Co. purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Sunshine Alchemists & Soap Co. purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

27.    Plaintiff Erin Laws d/b/a Sweet Salvation Candle Company ("Sweet Salvation Candle Company") is a retailer that produces and sells artisan designed candles, located in Morgantown, North Carolina. Sweet Salvation Candle Company is a citizen of the State of North Carolina. During the Class Period, Sweet Salvation purchased Fragrances and/or Fragrance Ingredients, which it used to produce Finished Fragrance Products. Sweet Salvation purchased Fragrances and/or Fragrance Ingredients other than directly from Defendants at a supracompetitive price and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' anticompetitive conduct.

**B.    Defendants**

28.    **Firmenich Defendants:**  Defendant DSM-Firmenich AG is a Swiss corporation that manufactures and sells flavors and fragrances.  DSM-Firmenich AG

13

is headquartered at Wurmisweg 576 Kaiseraugst, AG 4303 Switzerland and is listed on the Euronext Amsterdam stock exchange under the ticker symbol DSFIR.  DSM-Firmenich AG was created by the merger of DSM Group and Firmenich International SA, which was completed on May 8, 2023.  DSM-Firmenich AG has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates.  During the Class Period, DSM-Firmenich AG manufactured and/or sold Fragrances and Fragrance Ingredients to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries.

29.    Defendant Firmenich International SA is a Swiss corporation with its principal place of business located at Rue de la Bergere 7, Satigny CH-1242, Switzerland. Prior to its merger with DSM Group on May 8, 2023, Firmenich International SA had extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Firmenich International SA manufactured and/or sold Fragrances and Fragrance Ingredients to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries.

30.    Defendant Firmenich SA is a privately-owned Swiss corporation with its principal place of business located at Rue de la Bergere 7, Satigny CH-1242, Switzerland. Firmenich SA is the self-proclaimed "world's largest privately-owned

14

fragrance" company and manufactures and sells Fragrances to be used in consumer goods.[11] Firmenich SA "operates 46 manufacturing plants and six R & D centers around the world,"[12] including manufacturing sites in the United States.[13]

31.     Defendant Firmenich Inc. is a U.S. subsidiary of DSM-Firmenich AG, incorporated under the laws of Delaware, with its principal place of business located at 250 Plainsboro Road, Plainsboro, New Jersey 08536. Firmenich Inc. is the primary United States subsidiary of Firmenich SA and is responsible for developing and supplying fragrances to customers and, ultimately, purchasers of Fragrances in the United States. During the relevant period, Firmenich International SA and/or DSM-Firmenich AG have controlled Firmenich Inc. both generally and with respect to the conduct of Firmenich Inc. in furtherance of the unlawful acts alleged in this Complaint.

32.     Defendant Agilex Flavors & Fragrances, Inc. ("Agilex") is incorporated in Delaware with its principal place of business located at 140 Centennial Ave, #100, Piscataway, New Jersey 08854. Agilex manufactures Fragrances for air, home, and personal care, in addition to Fragrances for industrial

---

[11] *Firmenich Launches Focus Powered by EmotiCODE*, FIRMENICH (Nov. 30, 2022), https://www.firmenich.com/fragrance/press-release/firmenich-launches-focus-powered-emoticodetm.

[12]     *ESG        Report        2022*,        FIRMENICH        4, https://www.firmenich.com/sites/default/files/ESGReport_FY22.pdf.

[13] *Id.* at 32.

981296.1

use. Firmenich acquired Agilex in 2017. On May 9, 2023, Agilex announced that its new parent entity would be DSM-Firmenich AG.  Since the acquisition, Firmenich International SA and/or DSM-Firmenich AG have controlled Agilex both generally and with respect to the conduct of Agilex in furtherance of the unlawful acts alleged in this Complaint.

33.     Defendants DSM-Firmenich AG, Firmenich International SA, Firmenich SA, Firmenich Inc., and Agilex are herein collectively referred to as "Firmenich."

34.     **The Givaudan Defendants:** Defendant Givaudan SA is a Swiss corporation with its principal place of business located at Chemin de la Parfumerie 5, 1214 Vernier, Switzerland. Givaudan SA is listed on the SIX Swiss Exchange under the ticker symbol GIVN. Givaudan is one of the largest manufacturers of Fragrances in the world, with a large percentage of its Fragrances being used as components in household products. As stated on their website, Givaudan has "over 166 locations worldwide, with 78 production sites,"[14] including 22 in the United States.[15] These sites include locations in New Jersey, Wisconsin, Kentucky, Pennsylvania, Illinois, California, Nebraska, Ohio, Florida, and New York.

---

[14]     *Our Global Presence*, GIVAUDAN, https://www.givaudan.com/our-company/about-givaudan/our-global-presence (last accessed Feb. 4, 2024).

[15] *Locations*, GIVAUDAN, https://www.givaudan.com/locations (last accessed Feb. 4, 2024).

35.     Defendant Givaudan Fragrances Corporation is a U.S. subsidiary of Givaudan SA, incorporated in Delaware, with its principal place of business located at 717 Ridgefield Avenue, East Hanover, New Jersey 07936. Givaudan Fragrances Corporation transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of flavors and fragrances.

36.     Defendant Ungerer & Company, Inc. ("Ungerer") is a subsidiary of Givaudan SA, incorporated in Delaware with its principal place of business located at 4 Ungerer Way, Lincoln, Park, NJ 07035. Ungerer transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of flavors and fragrances. Givaudan SA acquired Ungerer in 2020, and since then has operated it as wholly-owned subsidiary.[16]

37.     Defendant Custom Essence LLC ("Custom Essence") is a limited liability company organized under the laws of New Jersey with its principal place of business located at 53 Veronica Ave, Somerset, New Jersey 00873. Custom Essence and associated entities develop natural Fragrances and Fragrance Ingredients at least

---

[16] *Givaudan Completes Acquisition of Ungerer*, GIVAUDAN (Feb. 20, 2020), https://www.givaudan.com/media/media-releases/2020/givaudan-completes-acquisition-ungerer.

in part for use in consumer goods.[17] Givaudan SA acquired Custom Essence in 2021, and since then has operated it as a wholly-owned subsidiary.

38.     Defendants Givaudan SA, Givaudan Fragrances Corporation, Ungerer, and Custom Essence LLC are herein collectively referred to as "Givaudan."

39.     **Symrise Defendants:** Defendant Symrise AG is a German stock corporation with its principal place of business located at Mühlenfeldstrasse 137603, Holzminden, Germany. Symrise AG manufactures and sells Fragrances and Fragrance Ingredients intended to enhance olfactory properties of consumer products. Symrise operates in roughly 160 countries, including the United States.[18] Symrise is the self-proclaimed "No. 1 supplier of Fragrance raw materials,"[19] with Fragrance offices in New Jersey, New York, Wisconsin, and South Carolina.

40.     Defendant Symrise Inc. is a U.S. subsidiary of Symrise AG, incorporated in New Jersey with its principal place of business located at 300 North St., Teterboro, NJ 07609. Symrise Inc. transacts or has transacted business in this

---

[17] *Givaudan Completes the Acquisition of Custom Essence*, Givaudan (Dec. 3, 2021),                   https://www.givaudan.com/media/media-releases/2021/givaudan-completes-acquisition-custom-essence.

[18]      *2022      Sustainability      Record      (GRI)*,      Symrise https://symrise.com/corporatereport/2022/downloads/SYM_gri_2022_EN.pdf.

[19] *Fragrance*, Symrise, https://www.symrise.com/scent-and-care/fragrance/ (last accessed Feb. 4, 2024).

District, and is engaged in the development, manufacture, and sale of flavors and fragrances.

41.     Defendant Symrise US LLC is a subsidiary of Symrise AG, organized under the laws of Delaware with its principal place of business located at 300 North Street, Teterboro, New Jersey 07608. Symrise US LLC transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of flavors and fragrances.

42.     Defendants Symrise AG, Symrise Inc., and Symrise US LLC are herein collectively referred to as "Symrise."

43.     **International Flavors & Fragrances Defendant:** Defendant International Flavors & Fragrances Inc. ("IFF") is incorporated in New York with its principal place of business located at 521 West 57th Street, New York, New York 10019. IFF is the self-proclaimed "leading creator and manufacturer of…scent and pharma solutions and complementary adjacent products, including cosmetic active and natural health ingredients, which are used in a wide variety of consumer products."[20] IFF is known for creating "fragrance compounds, fragrance ingredients, and cosmetic ingredients that are integral elements in the world's finest perfumes

---

[20] International Flavors & Fragrances Inc., 2021 Annual Report (Form 10-K), at 1 (Feb. 28, 2022).

981296.1

and best-known household and personal care products."[21] IFF has approximately 210 manufacturing facilities, creative centers and application laboratories in 45 countries, including their principal research and development centers located in New Jersey, Delaware, and California.[22]

44.     During the Class Period, each of the Defendants sold Fragrances in this District and throughout the United States.

45.     Each Defendant participated in the conspiracy to artificially inflate the price of Fragrances and committed overt acts in furtherance of this conspiracy as alleged herein in this District and the United States.

46.     The term "Defendants" as used in this Consolidated Complaint refers to and encompasses each Defendant and its successors, parent companies, subsidiaries, affiliates, employees, agents, officers, and directors.

## C.     Agents and Co-Conspirators

47.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while

---

[21] *Id.* at 3 ("Our consumer fragrances include three end-use categories of products: Fabric care, including laundry detergents, fabric softeners and specialty laundry products; Home Care, including household cleaners, dishwashing detergents and air fresheners; and Body Care, including personal wash, hair care and toiletries products.").

[22] *Id.* at 6.

actively engaged in the management and operation of Defendants' businesses or affairs.

48.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

49.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

## III.   JURISDICTION AND VENUE

50.     Plaintiffs bring this action on behalf of the Nationwide Class (defined below) under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3). This court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

51.     Plaintiffs also assert claims for actual and exemplary damages and injunctive relief pursuant to state antitrust, unfair competition, and consumer protection laws, and seeks to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state and District of Columbia laws, and the unjust enrichment common laws of the several States and District of Columbia. This Court has jurisdiction over the subject matter of this action pursuant

981296.1

to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some defendants; and (ii) Plaintiffs' state and District of Columbia law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

52.     This Court has personal jurisdiction over Defendants because, *inter alia*: a portion of the wrongdoing alleged in this Consolidated Complaint took place in this District; Defendants are authorized to do business in this District and systematically and continuously conduct business in this District; Defendants have sufficient minimum contacts with the United States, including this District; and Defendants otherwise intentionally avail themselves of the markets in this District through the promotion and marketing of its Fragrances in this District; Defendants engaged in anticompetitive conduct that was directed at and had the foreseeable and intended effect of causing injury to residents and businesses residing or located in this District. These facts render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

53.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## IV.    <u>FACTUAL ALLEGATIONS</u>

### A.    The Fragrance Industry

54.    A product's scent helps establish a positive and familiar olfactory response to the product. Smells are also linked to a product's functional use. For example, lemon or other citrus scents are often associated with cleanliness, and mint with freshness. Scents can also convey status; the smell of leather may signify luxury or richness. Research shows that most consumers "consider scent an essential and necessary component of everyday household products."[23] Indeed, the CEO of IFF's Scent division, Nicolas Mirzayantz, stated that "scent continues to be the #1 attribute driving purchase intent and even more importantly, the purchase repeat factor."[24]

55.    Consumer goods get their scents from fragrances.  Broadly speaking, a fragrance is a chemical mixture that has a smell or odor.[25]  Fragrances are derived from ingredients (natural or synthetic) and/or compounds.  The role of a fragrance is to impart a pleasant odor to the finished product and deliver a pleasant experience

---

[23] Rachel S. Herz et al, *A three-factor benefits framework for understanding consumer preference for scented household products: psychological interactions and implications for future development*, 7 COGNITIVE RESEARCH: PRINCIPLES & IMPLICATIONS            at            2            (2022), https://cognitiveresearchjournal.springeropen.com/articles/10.1186/s41235-022-00378-6.

[24] International Flavor & Fragrances Inc. Scent Learning Lab, Edited Transcript of conference call or presentation from April 5, 2021.

[25] *What is a Fragrance?*, IFRA, https://ifrafragrance.org/fragrance-and-you/what-is-a-fragrance (last accessed Feb. 4, 2024).

to the end user.  Fragrances are also used to disguise disfavored smells in the product, such that even products labelled as "unscented" may contain fragrances to mask the unpleasant smell of other ingredients, without giving the product a distinct scent.

56.    Manufacturers of consumer goods, like Plaintiffs and the Class, generally do not make their own fragrances.  Instead, they purchase Fragrances and Fragrance Ingredients from fragrance manufacturers, principally Defendants, for incorporation into various consumer products.  Defendants, in turn, source their raw materials further upstream.

### 1.    The Production of Fragrance

57.    The fragrance industry can be broken down into three segments.  First, there are the upstream suppliers of the raw materials used in the production of fragrances.  As described in greater detail below, these raw materials include both natural and synthetic materials.  Next, there are the manufacturers of fragrances, including Defendants, who use the raw materials to create Fragrance Ingredients and, as described in greater detail below, blend those Fragrance Ingredients into Fragrances.  Finally, the downstream part of the industry consists of the producers of various consumer products that embody the Fragrances and Fragrance Ingredients.  As discussed in greater detail below, these products generally fall into four distinct categories: fine fragrances (perfumes and colognes); fabric care (laundry detergents, fabric softeners, and specialty laundry products); home care

(household cleaners, dishwashing detergents, and air fresheners); and body care (personal wash, hair care, and toiletries products).[26]

58.    The following chart from a report by the industry trade association International Fragrance Association illustrates the three parts of the market:[27]



### a.    Upstream Suppliers

59.    Starting in the upstream part of the industry, companies produce the raw materials that will eventually make their way into consumer products.  These raw materials derive from both natural and synthetic sources.  Natural raw materials are extracted from natural sources, such as plants, trees, or animals, by physical or biotechnological procedures.

---

[26] International Flavors & Fragrances Inc., 2021 Annual Report (Form 10-K), at 4 (Feb. 28, 2022).

[27] *The Value of Fragrance: A Socio-Economic Contribution Study for the Global Fragrance Industry*, IFRA 11 (June 2019), https://ifrafragrance.org/docs/default-source/policy-documents/pwc-value-of-fragrance-report-2019.pdf?sfvrsn=b3d049c8_0.

60.    Synthetic raw materials are created in a lab and manufactured on an industrial scale.  More than 95% of the chemicals in synthetic fragrances are derived from petrochemicals, such as phthalates, synthetic musks, parabens, and benzene derivatives.[28]

### b.    Fragrance Ingredient and Compound Production

61.    Defendants source natural and synthetic ingredients for their fragrance businesses.   Within their business, Defendants make and sell both Fragrance Ingredients and Fragrances. Defendants thus occupy a critical point of the supply chain, producing fragrances that are essential to many consumer products.

62.    A Fragrance Ingredient is any basic substance used for its odor properties or malodor coverage as a component of a fragrance mixture, which can be natural or synthetic.  Per Defendant IFF's 2021 Annual Report, "[f]ragrance ingredients are natural and synthetic, and active and functional ingredients that are used internally and sold to third parties, including competitors, for use in the preparation of compounds."[29]

63.    Using natural raw materials, fragrance manufacturers use various methods to extract the aromatics to create "natural" Fragrance Ingredients.  The

---

[28]    *Synthetic Fragrances*, UP FRONT COSMETICS (May 14, 2020), https://upfrontcosmetics.ca/blogs/be-upfront/synthetic-fragrances.

[29] International Flavors & Fragrances Inc., 2021 Annual Report (Form 10-K), at 5 (Feb. 28, 2022).

981296.1

name for a specific natural ingredient stems from a combination of the raw material and the method of extraction. Thus, the same raw material may result in an essential oil, absolute, concrete, pomade or tincture depending upon the extraction method.[30] For example, the oil obtained by steam distillation of lavender is called essential oil of lavender or, simply, lavender oil.[31]

64.     Naturally-derived Fragrance Ingredients are temperamental. Much like grapes used to make wine, weather and other environmental impacts may affect the strength or scent of the raw materials used in Fragrance Ingredients. Additionally, these raw materials may negatively interact with other ingredients in consumer products. Jasmine oil is known to cause discoloration in soaps.[32]

65.     Defendants also make synthetic ingredients, which can either be nature-identical or artificial.

66.     Nature-identical synthetic Fragrances are made with synthetically derived ingredients to have the same key chemicals that define a fragrance found in nature and will be judged to have a similar odor. Some synthetic ingredients slightly modify the structural features of the natural material to make them less susceptible

---

[30] Claire Guillemin, LAW & ODEUR: FRAGRANCE PROTECTION IN THE FIELDS OF PERFUMERY AND COSMETICS 43–44 (1st ed. 2016) (citation omitted).

[31] Charles S. Sell, "Perfumery Materials of Natural Origin," The Chemistry of Fragrances: From Perfumer to Consumer 69 (2d ed. 2006).

[32] *Id.* at 81.

27

to degradation or interaction with other ingredients. For instance, the synthesis of jasmine is easier and more amendable to commercial products if slight modifications are made to the molecular chemistry.[33] Artificial fragrances are made from synthetic ingredients and have a scent and/or chemical composition not known to be found in nature.

67.    Defendants sell Fragrance Ingredients to each other, to other Fragrance makers, and to consumer product manufacturers, including Class members.

68.    As set forth in Defendant IFF's 2021 Annual Report, fragrance compounds are "combinations of multiple fragrance ingredients that are ultimately used by our customers in their consumer goods."[34] Compounding a fragrance generally means making a formulation of more than one ingredient.

69.    Numerous organizations have developed classifications of fragrances. In 1990, the French Society of Perfumers published its "Classification des Parfums" which included the following families: citrus, floral, fougere, chypre, woody, amber, and leather.[35]

---

[33] *Id.* at 82.

[34] International Flavors & Fragrances Inc., 2021 Annual Report (Form 10-K), at 4 (Feb. 28, 2022).

[35] Mans Boelens et al., *Classification of Perfumes and Fragrances*, 26 PERFUMER & FLAVORIST            28,          32          (Nov./Dec.          2001), https://img.perfumerflavorist.com/files/base/allured/all/document/2016/ 02/pf.PF_26_06_028_10.pdf.

70.   Defendants categorized their fragrances in a substantially similar manner. For example, Defendant Givaudan's website categorizes fragrances as follows:[36]



71.   The other Defendants use substantially similar descriptions to describe the fragrances offered to customers, including terms, such as, amber, citrus, floral, fresh, green musk, spicy, and woody.[37]

---

[36]   *Shaping Tomorrow's Signature Fragrances with Science*, GIVAUDAN, https://www.givaudan.com/fragrance-beauty/ingredients/fragrance-molecules (last accessed Feb. 4, 2024).

[37]   *See Fragrance Ingredients Online Compendium*, IFF, https://www.iff.com/portfolio/products/fragrance-ingredients/online-compendium (last accessed Feb. 4, 2024); *Interactive Fragrance Index*, GIVAUDAN, https://www.givaudan.com/fragrance-beauty/ingredients/fragrance-molecules (last accessed Feb. 4, 2024); *Ingredients Perfumery Catalogue, Main Olfactive Family*, FIRMENICH, https://www.firmenich.com/ingredients/ingredient-perfumery-catalog (last accessed Feb. 4, 2024); *Scent and Care, Aroma Molecules, Ingredient Finder*, SYMRISE, https://www.symrise.com/scent-and-care/aroma-molecules/ingredient-finder/ (last accessed Feb. 4, 2024).

72.    The production of Fragrance Ingredients and Fragrances occurs at different facilities around the world, including in the United States.  Within the United States, New Jersey is a primary production site for the fragrance industry. Givaudan manufactures fragrances in Mount Olive, New Jersey; IFF in Hazlet; Firmenich in Princeton; and Symrise in Teterboro. Fragrance Ingredients and Fragrances manufactured in New Jersey are sold throughout the United States. Defendants also import Fragrance Ingredients and Fragrances manufactured from their foreign operations into the United States for sale to customers.

73.    Fragrances are a multi-billion-dollar global industry. Annual sales of Fragrance Ingredients were approximately $9.1 billion in 2022.[38] Annual sales of Fragrance were valued at $35.08 billion in 2021.[39] In the United States, revenues in the fragrance market are estimated to reach $8.71 billion in 2023.[40]  Defendants

---

[38] *Fragrance Ingredients Market: Global industry trends, share, size, growth, opportunity and forecast 2023-2028*, RESEARCH AND MARKETS (Jan. 2023), https://www.researchandmarkets.com/reports/5732797/fragrance-ingredients-market-global-industry.

[39] Research and Markets, *Global Fragrance Market Report to 2027 - Accelerating E-Commerce Channels and Increasing Demand for Hygiene Products are Driving Growth,* GLOBENEWSWIRE NEWS ROOM (Nov. 10, 2022), https://www.globenewswire.com/en/news-release/2022/11/10/2552774/28124/en/Global-Fragrance-Market-Report-to-2027-Accelerating-E-Commerce-Channels-and-Increasing-Demand-for-Hygiene-Products-are-Driving-Growth.html.

[40]    *Fragrances – United States*, STATISTICA, https://www.statista.com/outlook/cmo/beauty-personal-care/fragrances/united-states (last accessed Feb. 4, 2024).

981296.1

collectively sell billions of dollars' worth of Fragrances and/or Fragrance Ingredients in the United States each year.[41]

### c.    Downstream Customers

74.    Fragrances and Fragrance Ingredients produced by Defendants are sold to Plaintiffs and the Class for use in consumer products.  Fragrances are most often shipped as oils, but on some occasions are shipped as powders.

75.    As IFF notes, the industry separates the use of fragrance compounds into several finished product categories, including fine fragrances (perfumes and colognes); fabric care (laundry detergents, fabric softeners, and specialty laundry products); home care (household cleaners, dishwashing detergents, and air fresheners); and body care (personal wash, hair care, and toiletries products).[42]  The following chart provides an illustrative example:[43]

---

[41] IAL Consultants, An Overview of the Global Flavours & Fragrances Market, 13th Edition (Sept. 2022).

[42] International Flavors & Fragrances Inc., 2021 Annual Report, at 4.

[43] IAL Consultants, An Overview of the Global Flavours & Fragrances Market, 13th Edition (Sept. 2022).



76.     A product's scent is a key driver of consumer preference both at the point of purchase and throughout its use. As a result of the critical importance of Fragrances to customer purchases—*i.e.*, the ability of a product's smell to drive sales for that product—Fragrances are indispensable to consumer goods manufacturers like Plaintiffs and the Class. Nevertheless, buyers generally remain sensitive to price.

77.     A report commissioned by the International Fragrance Association, an industry trade association, provides a diagram of the "value chain" of the fragrance industry:[44]

---

[44] *The Value of Fragrance: A Socio-Economic Contribution Study for the Global Fragrance Industry*, IFRA 8 (June 2019), https://ifrafragrance.org/docs/default-source/policy-documents/pwc-value-of-fragrance-report-2019.pdf?sfvrsn=b3d049c8_0



Figure 2: Value chain of the fragrance industry

78.    As a report explains: "The fragrance industry is a central link in a fragrance value chain that runs from ingredient suppliers to consumer product manufacturers and retailers."[45]

---

[45] *Id.* at 4.

79.    In 2022, the global Fragrance Ingredients market size reached $9.1 billion; it is expected to reach $12.9 billion by 2028.[46]

80.    Fragrance manufacturers such as Defendants generally sell their Fragrances into four sales channels: Consumer Packaged Goods manufacturers ("CPGs"), Small and Midsize Enterprises ("SMEs"), distributors, and to other Fragrance manufacturers.

81.    Global CPGs are generally large manufacturing conglomerates such as Unilever or Procter & Gamble. As CPGs manufacture products for mass distribution, they typically purchase very large quantities of Fragrances. The large size of the CPGs' purchases often allows them to negotiate contracts with Defendants. These contracts are of high value to Defendants and are called "Core Supplier Agreements."

82.    The Core Supplier Agreements will often be for customized Fragrances that the CPGs need for their specific branded products. As scent is extremely important to their brand recognition, CPGs need precise, consistent, and unique Fragrances from Defendants. Thus, Defendants create bespoke Fragrances for the CPGs that they will not sell to any other customers.

---

[46] *Report: Fragrance Ingredients Market: Global Industry Trends, Share, Size, Growth, Opportunity and Forecast 2023-2028*, IMARC GROUP, https://www.researchandmarkets.com/reports/5732797/fragrance-ingredients-market-global-industry (last accessed Feb. 4, 2024).

34

83.    In contrast, SMEs are smaller companies such as NuSkin, GoJo, or Bulk Apothecary. SMEs usually have smaller orders than CPGs, and generally purchase stock (as opposed to custom) Fragrances. If a SME reaches a certain volume of purchases, Fragrance manufacturers like Defendants may begin offering custom Fragrances. Normally, however, SMEs order Fragrances in considerably smaller volumes and received quoted prices that offer little room for negotiation.

84.    Fragrance manufacturers like Defendants often elect to sell through Distributors to avoid dealing in small quantities of product. In fact, Fragrance manufacturers generally have minimum purchase sizes of 25–100 kilograms depending on the Fragrance. Distributors often work exclusively for one Fragrance manufacturer, and each manufacturer typically only has two or three distributors per region. For example, The John D. Walsh Company identifies itself as the North American Distributor for IFF[47] and Vigon International operates as a fragrance warehouse and distributor and has strategic partnerships with Givaudan, DSM-Firmenich, and Symrise.[48]

85.    As Distributors generally do not supply CPGs or larger SMEs, Distributors sell almost exclusively stock Fragrances. Many producers of finished

---

[47] *About Us*, The John D. Walsh Company, Inc., https://www.johndwalsh.com/about-us/ (last accessed Feb. 4, 2024).

[48] *Our Partners*, Vigon, https://www.vigon.com/our-partners/ (last accessed Feb. 4, 2024).

35

goods purchase Fragrances other than directly from Defendants, through wholesalers and distributors.

## 2. Defendants' Fragrance Ingredients and Compounds are Interchangeable with Each Other

86.     Fragrance Ingredients are interchangeable commodity chemicals extracted from natural plants or created in a lab via synthesis processes.  Because Fragrance Ingredients are uniform chemicals, there is no meaningful difference between a Fragrance Ingredient (or combination of Fragrance Ingredients in the form of a Fragrance) produced by one Defendant as compared to another.

87.     Symrise noted as much in its 2022 Corporate Report, stating, "Most of the fragrance ingredients we sell to our customers in our formulations are commodity products.  The components are no secret.  Anyone could use them and purchase the compounds on the market or even produce them themself [*sic*]."[49]

88.     Fragrance compounds produced by Defendants are also interchangeable.  Beginning in the late 20th century, Defendants gained the ability to reverse engineer each other's fragrances using technologies, such as gas chromatography and mass spectrometry. The ability to reverse engineer a competitor's product means that a competitor can copy a proprietary blend and

---

[49] SYMRISE, *Sharing Values: Creating Resources with a Circular Economy: Corporate Report 2022* 79 (March 8, 2023), https://symrise.com/corporatereport/2022/downloads/SYM_corporatereport_2022_EN.pdf.

compete on price. Defendants' technical ability to reverse engineer each other's product has only increased with time. Larger companies, *e.g.*, Defendants, have more capability to reverse engineer their competitors' products.

89.   Firmenich stated in a published study that mass chromatography and mass spectrometry "has threatened, if not eliminated, proprietary secrets" in the fragrance and flavor industry.[50] This means fragrance manufactures, like Defendants, could easily replicate each other's scents and create the same fragrances.

90.   In fact, Defendants do provide overlapping products.   That is, Defendants sell similar fragrance profiles even if they market them as something unique or different.  Fragrances and Fragrance Ingredients based on the same active ingredients are largely interchangeable.

91.   IFF's 2021 annual report noted the fungibility of its products as a potential risk to its business.  Specifically, IFF noted that "increasing [its Fragrance] prices to our customers could result in long-term sales declines or loss of market share if our customers find alternative suppliers or choose to reformulate their

---

[50] Vincent Keller and Randy Burgess, ADEXA, *Firmenich: Case Study: The Flavor and Fragrance of Success* (Oct. 2021), https://www.adexa.com/wp-content/uploads/2021/10/Case-Study_-Firmenich_Final.pdf.

consumer products to rely less on our products, which could have an adverse long-term impact on our results of operations."[51]

92.    Similarly, Givaudan has admitted:

there is a very high degree of supply-side substitutability for fragrances and that this market, therefore, should not be further segmented in a narrower way such as distinguishing between different applications (consumer products such as soaps/detergents, cosmetics, toiletries and other applications such as fine fragrances).  It explains that any fragrance producer can and does produce any fragrance irrespective of its end-use and can switch production relatively easily from one fragrance to another once the production equipment has been cleaned."[52]

93.    The substitutability of Defendants' Fragrances and Fragrance Ingredients should have led to price competition among Defendants and substantially restrained their abilities to increase prices unilaterally.

### 3.    Defendants Supply Each Other with Fragrance Ingredients

94.    Defendants primarily manufacture Fragrance Ingredients to support their own fragrance compound business.

95.    Defendants also buy and sell excess Fragrance Ingredients between one another.[53]  By transacting with one another, Defendants learn of capacity and price

---

[51] International Flavors & Fragrances Inc., 2021 Annual Report (Form 10-K), at 14 (Feb. 28, 2022).

[52] European Commission, Givaudan/Quest International Merger Case No. COMP/M.4507, at 3-4 (Feb. 21, 2007).

[53] Claire Guillemin, LAW & ODEUR: FRAGRANCE PROTECTION IN THE FIELDS OF PERFUMERY AND COSMETICS 92, 423, 427 (1st ed. 2016) (citation omitted); SYMRISE,

points for Fragrance Ingredients from one another. These inter-Defendant sales increased their dependency on each other and provided a mechanism to enforce and monitor their conspiracy.

**B.     The Structure and Characteristics of the Fragrance and Fragrance Ingredient Market Support the Existence of a Conspiracy**

96.     The structure and other characteristics of the market for Fragrances and Fragrance Ingredients make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

**1.     The Market is Highly Concentrated and Defendants are the Dominant Firms**

97.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

98.     Defendants are the "four largest providers" in the market, and "together have a market share of 64%" in the global fragrances market.[54]  Defendants' U.S. market shares are understood to be similar to their global market shares:[55]

---

*Sharing Values: Developing Resources: Financial Report 2018* 10 (Mar. 13, 2019), link available at https://www.symrise.com/investors/financial-results/.

[54] SYMRISE, *2022 Financial Report* 12–13 (Mar. 8, 2023), link available at https://www.symrise.com/investors/financial-results/.

[55] *Id.* at 13.



99.     The United States is one of the largest markets for Fragrances and Fragrance Ingredients. For instance, in IFF's 2021 annual report, it disclosed North American sales comprising more than 30% of global sales.[56] Out of these North American sales, more than 90% were U.S. sales:[57]

| *(DOLLARS IN MILLIONS)* | Net Sales by Geographic Area | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Europe, Africa and Middle East . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4,093 | $1,987 | $2,082 |
| Greater Asia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,728 | 1,162 | 1,163 |
| North America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,499 | 1,228 | 1,170 |
| Latin America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,336 | 707 | 725 |
| Consolidated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $11,656 | $5,084 | $5,140 |

| *(DOLLARS IN MILLIONS)* | Net Sales by Geographic Area | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Net sales related to the U.S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,211 | $1,093 | $1,053 |
| Net sales attributed to all foreign countries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,445 | 3,991 | 4,087 |

---

[56] International Flavors & Fragrances Inc., 2021 Annual Report (Form 10-K), at 106 (Feb. 28, 2022).
[57] *Id.*

40

100.   One market analyst estimated the North American flavors and fragrances market to be more than $8 billion in 2021, around 25% of the global market, with projected growth to $9.6 billion by 2026:[58]

**Total Global Consumption of Flavours & Fragrances by Region, 2021-2026 (US$ Millions)**

| Region | 2021 (US$ M) | 2026 (US$ M) | 2021-2026 (% Growth p.a.) |
|---|---|---|---|
| Africa & Middle East | 2,021.9 | 2,540.8 | 4.7 |
| Asia | 13,690.5 | 18,279.1 | 6.0 |
| Central & North America | 8,181.0 | 9,608.3 | 3.3 |
| Central & Eastern Europe | 2,029.7 | 2,219.9 | 1.8 |
| South America | 2,248.2 | 2,693.2 | 3.7 |
| Western Europe | 5,655.4 | 6,585.7 | 3.1 |
| **Global Total** | **33,826.7** | **41,927.0** | **4.4** |

101.   Defendants have further cemented their control of the Fragrances market through the acquisition of rivals, which has resulted in significant industry consolidation. As one industry analyst has noted, Defendants' total share of the market:

> is higher than previous years due to acquisitions and mergers.  The opportunity to supply packages of products to their customers has become ever more attractive for the flavour and fragrance houses, reflected in various sideways and backwards integration moves in recent years.  This is exemplified by the merger of IFF and DuPont's Nutrition & Biosciences (N&B) business and the pending merger between Firmenich and DSM.[59]

---

[58] IAL Consultants, An Overview of the Global Flavours & Fragrances Market, 13th Edition (Sept. 2022).

[59] *Id.*

41

102. Since at least 2016, Defendants have "focused on so-called bolt-on acquisitions" to rapidly consolidate the market,[60] leading the industry to be "dominated by just a few companies."[61] IFF, in its 2022 Annual Report, noted that "there has been increased consolidation among our competitors."[62]

103. Recent examples of fragrance-industry consolidation include:

| Year | Acquisitions |
|------|--------------|
| 2014 | • IFF acquired Aromor Flavors and Fragrances Ltd.[63]<br>• Symrise acquired Diana Group in a transaction valued at €1.3 billion.[64] |
| 2015 | • IFF acquired Ottens Flavors.[65] |

---

[60] Gillian Tan, *International Flavors & Fragrance: When Bland Is Good*, BLOOMBERG (May 10, 2016), https://www.bloomberg.com/opinion/articles/2016-05-10/international-flavors-fragrances-when-bland-is-good.

[61] Andy Hoffman et al., *DSM Forms Flavor Giant with $21 Billion Deal for Firmenich*, BLOOMBERG (May 31, 2022), https://www.bloomberg.com/news/articles/2022-05-31/royal-dsm-agrees-to-merge-with-swiss-fragrance-maker-firmenich.

[62] International Flavors & Fragrances Inc., 2022 Annual Report (Form 10-K), at 18 (Feb. 27, 2023).

[63] *IFF Acquires Aromor to Strengthen Its Fragrance Ingredients and Fragrance Creation Capabilities*, IFF (Jan. 16, 2014), https://ir.iff.com/news-releases/news-release-details/iff-acquires-aromor-strengthen-its-fragrance-ingredients-and.

[64] *Symrise AG Successfully Closes Acquisition of Diana Group*, SYMRISE (July 29, 2014), https://www.symrise.com/newsroom/article/symrise-ag-successfully-closes-acquisition-of-diana-group/.

[65] *IFF Completes Acquisition of Ottens Flavors*, IFF (May 1, 2015), https://ir.iff.com/news-releases/news-release-details/iff-completes-acquisition-ottens-flavors.

42

| 2016 | • IFF acquired David Michael & Company, Inc.[66] |
|---|---|
| 2017 | • Firmenich acquired Agilex Fragrances.[67] |
| 2018 | • Firmenich acquired Flavourome.[68]<br>• Firmenich acquired Natural Flavors.[69]<br>• Givaudan[70] acquired Expressions Parfumées.[71]<br>• Agilex (Firmenich) acquired Fragrance West.[72]<br>• Givaudan acquired Naturex.[73] |

---

[66] *IFF Completes Acquisition of David Michael*, IFF (Oct. 7, 2016), https://ir.iff.com/news-releases/news-release-details/iff-completes-acquisition-david-michael.

[67] *Firmenich Completes Acquisition of Agilex Fragrances*, FIRMENICH (July 11, 2017), https://www.firmenich.com/fragrance/press-release/firmenich-completes-acquisition-agilex-fragrances.

[68] *Firmenich Completes Acquisition of "Flavourome", to Expand Presence in Africa*, FIRMENICH (Feb. 5, 2018), https://www.firmenich.com/taste-and-beyond/press-release/firmenich-completes-acquisition-flavourome-expand-presence-africa.

[69] *Firmenich Completes Acquisition of "Natural Flavors", Leader in Organic-Certified Flavors*, FIRMENICH (Feb. 6, 2018), https://www.firmenich.com/taste-and-beyond/press-release/firmenich-completes-acquisition-natural-flavors-leader-organic.

[70] *Investor Presentation*, GIVAUDAN (Feb. 2023), https://www.givaudan.com/files/giv-2023-investor-presentation-feb.pdf.

[71] *Givaudan Completes the Acquisition of Expressions Parfumées*, GIVAUDAN (May 29, 2018), https://www.givaudan.com/media/media-releases/2018/givaudan-completes-acquisition-expressions-parfumees.

[72] *Agilex Fragrances Acquires Fragrance West to Expand Presence on United States West Coast*, FIRMENICH (June 25, 2018), https://www.firmenich.com/fragrance/press-release/agilex-fragrances-acquires-fragrance-west-expand-presence-united-states.

[73] *Givaudan Completes the Acquisition and Delisting of Naturex*, GIVAUDAN (Sept. 18, 2018), https://www.givaudan.com/media/media-releases/2018/givaudan-completes-acquisition-and-delisting-naturex.

43

|  | • IFF acquired Frutarom.[74] |
|  | • Firmenich acquired Senomyx.[75] |
| 2019 | • Givaudan acquired Golden Frog.[76] |
|  | • Givaudan announced agreement to acquire AMSilk GmbH's cosmetics unit.[77] |
|  | • Givaudan acquired Albert Vieille.[78] |
|  | • Givaudan acquired Fragrance Oils.[79] |
|  | • Givaudan acquired Drom.[80] |
| 2020 | • Symrise entered into agreement to purchase Sensient Technologies Corporations' fragrances and aroma chemicals business unit.[81] |

[74] *IFF Completes Combination with Frutarom, Establishing a Global Leader in Taste, Scent and Nutrition*, IFF (Oct. 4, 2018), https://ir.iff.com/news-releases/news-release-details/iff-completes-combination-frutarom-establishing-global-leader.

[75] *Firmenich Successfully Completes Tender Offer to Acquire Senomyx*, FIRMENICH (Nov. 2, 2018), https://www.firmenich.com/taste-and-beyond/press-release/firmenich-successfully-completes-tender-offer-acquire-senomyx.

[76] *Givaudan Completes Acquisition of Vietnamese Flavour Company Golden Frog*, GIVAUDAN (Sept. 2, 2019), https://www.givaudan.com/media/media-releases/2019/acquisition-golden-frog-completed.

[77] *Givaudan to Acquire Cosmetics Business of AMSilk*, GIVAUDAN (Apr. 29, 2019), https://www.givaudan.com/media/media-releases/2019/givaudan-acquire-cosmetics-business-amsilk.

[78] *Givaudan Completes the Acquisition of Albert Vieille*, GIVAUDAN (May 6, 2019), https://www.givaudan.com/media/media-releases/2019/givaudan-completes-acquisition-albert-vieille.

[79] *Givaudan Acquires Fragrance Oils*, GIVAUDAN (Aug. 20, 2019), https://www.givaudan.com/media/media-releases/2019/givaudan-acquires-fragrance-oils.

[80] *Givaudan Completes the Acquisition of Drom*, GIVAUDAN (Sept. 6, 2019), https://www.givaudan.com/media/media-releases/2019/givaudan-completes-acquisition-drom.

[81] *Symrise to Expand Scent & Care Activities Through Acquisition of Sensient's Fragrances Business Unit*, SYMRISE (Nov. 23, 2020),

981296.1

| 2021 | • IFF merged with DuPont's Nutrition & Biosciences business.[82]<br>• Givaudan acquired Custom Essence.[83] |
|------|------------------------------------------------------------------------------------------------------------|

104.   In May 2023, DSM and Firmenich completed a merger[84] that gives its new entity—DSM-Firmenich AG valued at roughly $21 billion—"comparable footing to IFF," after IFF's combination with DuPont.[85]

105.   In sum, Defendants have acquired a number of rivals in recent years with operations focused in the United States, making the Fragrance and Fragrance Ingredient Market in the United States exceptionally concentrated.

### 2.   Defendants are Vertically Integrated

106.   Defendants are vertically integrated to varying degrees.  This means that Defendants control several stages of Fragrance production, including the sourcing of raw materials, manufacturing, and distribution.  Defendants describe

---

https://www.symrise.com/newsroom/article/symrise-to-expand-scent-care-activities-through-acquisition-of-sensients-fragrances-business-unit/.

[82] *IFF to Complete Merger with DuPont's Nutrition & Biosciences Business*, IFF (Feb. 1, 2021), https://ir.iff.com/news-releases/news-release-details/iff-complete-merger-duponts-nutrition-biosciences-business.

[83] *Givaudan Completes the Acquisition of Custom Essence*, GIVAUDAN (Dec. 3, 2021), https://www.givaudan.com/media/media-releases/2021/givaudan-completes-acquisition-custom-essence.

[84] *Firmenich Completes Merger of Equals With DSM*, FIRMENICH (May 9, 2023), https://www.firmenich.com/company/press-release/firmenich-completes-merger-equals-dsm.

[85] Samantha Oller, *DSM, Firmenich to Merge into 'Powerhouse of Innovation and Creativity'*, FOODDRIVE (June 2, 2022), https://www.fooddive.com/news/dsm-firmenich-to-merge-into-powerhouse-of-innovation-and-creativity/624759/.

their vertical integration as a strategic advantage.  For example, in connection with an acquisition, Givaudan boasted that additional vertical integration would "enhance our industry leadership."[86]  IFF boasted that its vertical integration in bioscience "will be a key driver of our innovation platform,"[87] and Firmenich described its "unmatched, vertically integrated portfolio" as a "unique value proposition."[88] Robust vertical integration, like Defendants' operations, creates and reflects significant market power by alleviating sourcing issues, driving greater efficiencies, reducing costs, and allowing for more control along the manufacturing and distribution process.  As a result, vertical integration reinforces barriers to entry into the Fragrance market because prospective or smaller competitors cannot compete with the efficiencies and scale of Defendants.

---

[86] *Givaudan Completes Acquisition of Ungerer*, GIVAUDAN (Feb. 20, 2020), https://www.givaudan.com/file/207451/download.

[87] Nicolas Mirzayantz, Remarks at International Flavor & Fragrance Inc. Presents at Barclays Global Consumer Staples Conference (Sept. 09, 2021), transcript available at https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Barclays-Global-Consumer-Staples-Co-37765129/.

[88] *Firmenich Appoints New Leadership for Integrated Perfumery & Ingredients Organization*, FIRMENICH (Feb. 8, 2023), https://www.firmenich.com/fragrance/press-release/firmenich-appoints-new-leadership-integrated-perfumery-ingredients.

### 3.     Barriers to Entry are High

107.   A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from supracompetitive pricing.  When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.  The market for Fragrances and Fragrance Ingredients has high barriers to entry.

108.   Factors that deter new entry to the Fragrances market include, but are not limited to:

**Regulations**.  Fragrance suppliers are subject to legal and regulatory frameworks (*e.g.*, environmental, health, and safety) that are geographically specific.  Large suppliers with an international presence and more robust resources have an advantage in navigating such regulations because they will have already invested in a compliance infrastructure as well as in lobbyists to influence the legal and regulatory framework.

**Scale**.  Defendants benefit from economies of scale, which occur when increased output leads to lower average costs.  Hopeful new entrants to the Fragrances market find it difficult to compete because their average costs would be much higher than the larger incumbents, and because they lack similar promotion recourse.   The mature and relatively saturated nature of the market also acts as a deterrent to new entrants.

**Access to Raw Materials**.  Raw materials are sourced from all over the globe with attendant supply chain complexity.  Access to materials used as inputs is of critical importance to the ability of a firm to enter the market.   Defendants, as the largest suppliers, maintain substantial control over access to key ingredients because they produce those ingredients themselves.

**High Capital Requirements**.  Only a few Fragrance companies have the skills, capacity, and resources to manufacture Fragrances.  The amount of research and development, marketing, and capital expenditure required to enter this industry and gain market share has limited the number of industry operators.  To gain market share, companies spend large sums of money on marketing and to acquire competitors.  New entrants must overcome the need for substantial financing.

109.   Defendants IFF and Givaudan have repeatedly touted to their investors that the Fragrance market is protected by high barriers to entry.  Givaudan listed the industry's "high barrier to entry (complexity, R&D, consumer insight, regulations, etc.)" as a key investment highlight in a 2022 investor presentation.[89]  Givaudan's Chief Financial Officer, Alison Cornell, boasted during the Deutsche Bank Global Consumer Conference on June 14, 2016, "the barriers to entry favor the large players, as they include an increasing global (technical difficulty) regulatory environment; the need for capital investment in manufacturing facilities; the significant and ongoing investment in research and development; the complexity of managing global customers; and ongoing investment in ingredients, people, intellectual property, and processes."[90]  Symrise gave a similar presentation to its

---

[89]   *Investor Presentation*, GIVAUDAN 32 (Jan. 2022), https://www.givaudan.com/files/giv-2022-investor-presentation_jan.pdf.

[90] Transcript: International Flavors &Fragrances Inc. Presents at DeutscheBank Global Consumer Conference, Zonebourse (June 14, 2016), https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Deutsche-Bank-Global-Consumer-Confe-38010620/.

48

981296.1

investors in 2019, stating high barriers to entry included "core list system and increasing regulatory pressure."[91]

110.   Givaudan reiterated these points again in a February 2023 investor presentation, stating that the company is protected by "**High barriers to entry** and high shifting costs for customers."[92]   Givaudan directly linked high barriers to entry with market share, stating in a February 2020 investor presentation that Defendants enjoyed "[l]eading market share…supported by substantial barriers to entry that continue to **protect incumbents**."[93]

111.   In a 2018 article, merger and acquisition advisory firm Grace Matthews, reiterated that barriers to entry in Fragrances and flavors are high, as "technical expertise is highly valued, and regulatory compliance can be a significant issue as many products made by the F&F industry come into contact with the human

---

[91]    *Symrise Investor Presentation*, SYMRISE 6 (June 2019), https://www.symrise.com/fileadmin/symrise/Corporate/Investors/Financial_calend ar_and_presentations/190611_Symrise_Investor_Presentation_Paris.pdf. The "core list system" is a reference to Perfume Manufacturers' practice of only working with an exclusive and limited list of suppliers. *See* Jeb Gleason-Allured, *Comment: Core Lists in Perfumery*, PERFUMER & FLAVORIST (Nov. 14, 2008), https://www.perfumerflavorist.com/events/event-coverage/news/21870746/comment-core-lists-in-perfumery.

[92]    *Investor Presentation*, GIVAUDAN 6 (Feb. 2023), https://www.givaudan.com/files/giv-2023-investor-presentation-feb.pdf (emphasis original).

[93]    Investor Presentation, GIVAUDAN 6 (Feb. 2020), https://www.givaudan.com/files/giv-2020-investor-presentation-jan-oct.pdf (emphasis added).

body."[94]   Marifaith Hackett, Director of Specialty Chemicals with IHS Markit, explained, "the business is fairly opaque to outsiders – by design, no doubt – and any new entrant to the F&F industry would have to expect a fairly sharp learning curve" and "[n]ew entrants tend to start out small."[95]  The author of the article added, "[t]hese new entrants are often founded by individuals with pre-existing knowledge and contacts in the industry."[96]

### 4.   The Buy-Side of the Market is Unconcentrated

112.   The fact that the nature of the buy-side of the fragrance market is not concentrated is consistent with collusion. With a large number of buyers, each of which forms a small share of the total marketplace, there is less incentive for cartel members to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

113.   IFF, for example, "had no customers that accounted for greater than 10% of consolidated net sales in 2022, 2021 and 2020."[97]  In 2021, IFF's "25 largest

---

[94] Vincent Valk, *High Valuations Do Not Stop Flavors and Fragrances Deals*, GRACE MATTHEWS 2 (Dec. 6, 2018), https://gracematthews.com/wp-content/uploads/2021/11/Highvaluationsdonotstopflavorsandfragrancesdeals.pdf.

[95] *Id.*

[96] *Id.*

[97] International Flavors & Fragrances Inc., 2022 Annual Report (Form 10-K), at 91 (Feb. 27, 2023).

customers, a majority of which were multi-national consumer products companies, collectively accounted for [only] 29% of [its] sales in the aggregate."[98]

### 5.      Demand for Fragrances is Inelastic

114.   Economic theory recognizes that industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices.   There are two primary characteristics that demonstrate the inelasticity of demand for the Fragrances and Fragrance Ingredients market: a lack of substitute goods and the product being just one portion of the overall cost of the Finished Fragrance Product.

115.   Substitute goods can serve to restrain price increases and temper the effects of a price-fixing conspiracy. Even though Fragrances with the same scent are fungible, Fragrances are the only products that can provide the scent in customer products. There are no suitable substitute goods for Fragrances or Fragrance Ingredients in the market that would work to restrain price increases of fragrances.

### 6.      Fragrance Ingredients are Interchangeable Commodities

116.   As detailed above, Defendants' Fragrances and Fragrance Ingredients are interchangeable commodities.  Coordination is easier with a commodity product because firms wishing to form a cartel can more easily monitor and detect defections

---

[98] International Flavors & Fragrances Inc., 2021 Annual Report (Form 10-K), at 18 (Feb. 28, 2022).

981296.1

from a price-fixing agreement where observed differences in prices, other than those arising because of differences in product grade, for example, are more likely to reflect cheating on the conspiracy than some kind of individualized arrangement.

### 7. Fragrances are Nondurable Products

117. Additionally, Fragrances and Fragrance Ingredients are nondurable products with a limited shelf life, some with "Best before" dates of only one year after manufacture. The market for a nondurable good is easier to cartelize than a durable good market due to lower temptation for cartel members to cheat on sales of nondurable goods and less opportunity to price discriminate based on customers' different demand elasticities.

### 8. Switching Costs are High

118. The Fragrances and Fragrance Ingredient Market is characterized by the presence of particularly high switching costs. Changing a product's Fragrance requires the manufacturers to undergo several steps, including potentially obtaining regulatory approval and conducting consumer testing to make sure the new Fragrance receives customer acceptance.[99] These switching costs are also a significant barrier to entry for new players because customers are hesitant to change

---

[99] *Chemical Insights*, GRACE MATTHEWS 2 (Summer 2018), https://gracematthews.com/wp-content/uploads/2021/10/ChemicalNewsletter-Summer2018-1.pdf.

from established manufacturers, like Defendants, to cheaper, but unproven, alternatives.

**9.     Industry Associations Provided Defendants with Forums to Collude and Assisted Defendants in Carrying out Their Conspiracy**

119.   The European Commission announced that one of the entities that was raided on March 7, 2023, was an unnamed industry association, which has assisted Defendants in carrying out their conspiracy.  The EC stated that it "has concerns that companies and an association in the fragrance industry worldwide may have violated EU antitrust rules that prohibit cartels and restrictive business practices."[100]

120.   Courts have found industries in which main competitors participate in trade associations and frequently communicate with each other are susceptible to collusion.   Defendants control the most important trade associations and self-regulating bodies in the Fragrance and Fragrance Ingredient Market.  This makes the fragrance market more susceptible to collusive behavior because the trade organizations provide forums for Defendants to exchange sensitive information such as pricing and outputs.  Defendants use their control of industry associations to facilitate their conspiracy.

---

[100] Foo Yun Chee & Oliver Hirt, *EU, UK, Swiss Probe Suspected Fragrance Cartel, Givaudan Confirms Cooperation*, REUTERS (last updated Mar. 7, 2023), https://www.reuters.com/world/europe/eu-antitrust-regulators-raid-companies-association-fragrance-sector-2023-03-07/.

121.    To start, Defendants coordinated and conspired through their control of International Fragrance Association ("IFRA").  IFRA is an official self-regulatory representative body of the worldwide fragrance industry with the stated goal of representing "the collective interests of the industry and promote the safe use and enjoyment of fragrances around the world."[101]  IFRA is currently limited to seven regular members: Defendants, Robertet Groupe, Takasago International Corporation, and BASF.

122.  Defendants control IFRA's board.  For example, Symrise's Chief Sustainability Officer, Hans Holger Gliewe, has been the chair of IFRA since April of 2020.  Prior to Gliewe, Michael Carlos—previously President of Givaudan's Fragrance Division and currently a board member of Givaudan—served as chair of IFRA from 2015 to 2020.  To this day, every Defendant maintains a representative on IFRA's board.

123.  IFRA has served as a mechanism to coordinate and facilitate Defendants' conspiracy.  Every year, IFRA hosts the Global Fragrance Summit, which is a multi-day event at which Defendants meet and intermingle.[102]  IFRA also holds other events throughout the year for its members (including Defendants).

---

[101] *Making the difference – in every sense*, IFRA, https://ifrafragrance.org/about-ifra/introduction (last visited Feb. 4, 2024).

[102] *Dialogue*, IFRA, https://ifrafragrance.org/priorities/dialogue (last visited Feb. 4, 2024).

Through such events, Defendants have ample opportunity to meet and coordinate. Indeed, the 2022 IFRA Global Fragrance Summit held from November 8, 2022 to November 10, 2022 in São Paulo, Brazil was attended by several representatives of Defendants, including Greg Adamson, the Senior Vice President of Global Regulatory Affairs at Givaudan; Jeremy Compton, Givaudan's Head of Science and Technology; Matteo Magnani, Firmenich's Chief Consumer and Innovation Officer, Ilaria Resta, Firmenich's Global President of Perfumery; Joris Theewis, IFF's Global Regulatory Strategic Lead; Gregory Ladics, IFF's Head of Product Safety and Chemical Management; and Eder Ramos, Symrise's Global President of its Fragrance Division.[103]

124.  In addition to IFRA, Defendants also control several other trade associations that provide forums for their collusive communications.  After jointly deciding to leave the then-extant North American trade association, in March 2021, Defendants launched their own North American trade organization, Fragrance Science & Advisory Council ("FSAC").[104]  Reporting at the time explained that

---

[103]  Global Fragrance Summit (Sao Paulo, Brazil 2022), available at https://www.mayerbrown.com/-/media/files/perspectives-events/events/2022/11/ifragfs2022_program.pdf?rev=dabc93abfbc74ddd82da63e6a7db58d0 (last accessed Feb. 5, 2024).

[104]  Lauren Nardella, *World's Biggest Fragrance and Flavor Firms Join Forces to Champion Science in Public Policy*, HBW INSIGHT (Mar. 31, 2021), https://hbw.pharmaintelligence.informa.com/RS151176/Worlds-Biggest-Fragrance-And-Flavor-Firms-Join-Forces-To-Champion-Science-In-Public-Policy.

FSAC "unites the world's leading fragrance and flavor companies in an effort to drive science-based public policy in North America."[105]   FSAC set out with the express goal to focus on "business-to-business audiences" in order to "defend[] fragrance ingredients" against, among other things, criticism from "consumer[s]."[106] At the beginning, Defendants were the *only* members of FSAC.  To date, FSAC has added only one non-Defendant member—Bath and Body Works.

125.   FSAC provides Defendants with a unique opportunity to collude.  In addition to standard board and committee meetings, FSAC holds annual meetings. The inaugural annual meeting was held on December 9, 2021, and was attended by all Defendants.  According to a press release, FSAC's board and several committees, which are occupied by representatives of Defendants, "met to review progress and map goals and priorities for 2022."[107]

126.   As mentioned above, prior to founding FSAC, Defendants belonged to the North America-focused Fragrance Creators Association ("FCA").[108]  The timing

---

[105] *Id.*

[106] *Id.*

[107] *The Fragrance Science & Advocacy Council Holds Inaugural Annual Meeting in December 2021*, FSAC (Feb. 7, 2022), https://fsac.org/communications/fragrance-science-advocacy-council-holds-inaugural-annual-meeting-december-2021.

[108] Lauren Nardella, *World's Biggest Fragrance and Flavor Firms Join Forces to Champion Science in Public Policy*, HBW INSIGHT (Mar. 31, 2021), https://hbw.pharmaintelligence.informa.com/RS151176/Worlds-Biggest-Fragrance-And-Flavor-Firms-Join-Forces-To-Champion-Science-In-Public-Policy.

of Defendants' departure from FCA and the founding of FSAC is highly suspicious—Defendants all announced they were leaving FCA on May 27, 2020. In recent years, in direct conflict with Defendants' interests, FCA had been increasingly prioritizing consumer-focused fragrance safety transparency issues. Instead of cooperating with the FCA's evolving mission towards greater safety and transparency measures, Defendants created their own organization—FSAC—that they controlled to lobby for legislation that would benefit Defendants at the expense of others (*i.e.*, smaller competitors and potential new entrants into the markets, and their own customers). However, after the investigation into Defendants began, IFF left FSAC and rejoined FCA. In the announcement that IFF rejoined FCA, FCA made no mention of the fact that IFF once left the trade association and provides no reason for its rejoining. It is reasonable to infer that IFF recognized that FSAC presented a unique opportunity to collude with its main competitors with only one other participant. It is also reasonable to infer that IFF left FSAC in an attempt to shield itself from antitrust liability once it realized it was under scrutiny from antitrust authorities.

127.   Defendants also are all members of the Research Institute for Fragrance Materials ("RIFM"). RIFM holds itself out as a leading resource for the safe use of Fragrance Ingredients and serves as the industry regulator in conjunction with IFRA. RIFM conducts and publishes safety assessments of all ingredients used for their

57

aroma-producing properties.  RIFM's activities include conducting toxicity tests and allergy and photo toxicity testing of raw materials.  After testing, RIFM submits the results of the screening of the materials to IFRA, which then ensures Fragrance manufacturers' compliance with all relevant legislation and the standards of safety and conduct in the industry set by IFRA.  As Defendants have authority in both RIFM and IFRA, they are able to influence the testing process for fragrances and regulatory and safety standards for the Fragrances market.

128.   Defendants all serve on RIFM's Advisory Committee and are the most prominent members of RIFM's "Core Teams," which "advise and consult on strategic issues related to RIFM's goals."  Thus, Defendants attend meetings of RIFM's Advisory Committee and Core Teams together, and they exert significant influence over RIFM's activities.

129.   While the FCA has focused their efforts on greater transparency with customers, the Defendant-controlled FSAC has been using its power to "closely track[] fragrance-related developments at the U.S. Food and Drug Administration and U.S. Environmental Protection Agency and could be 'front and center' in discussions regarding fragrance ingredients."[109]

---

[109] Lauren Nardella, *World's Biggest Fragrance and Flavor Firms Join Forces to Champion Science in Public Policy*, HBW INSIGHT, https://hbw.pharmaintelligence.informa.com/RS151176/Worlds-Biggest-Fragrance-And-Flavor-Firms-Join-Forces-To-Champion-Science-In-Public-Policy.

130.   Defendants have used their combined market share and chokehold on the FSAC to suppress innovation and customer choice, and delay safety and transparency initiatives advocated for by competitors. Defendants will continue to wield trade organizations to maintain their dominant market share; as FSAC President and Chairman of the Board admitted, "it will be one of these four [fragrance] houses that will own the majority of the science and safety assessment data."[110] Nearly exclusive access to and control over this data will make it nearly impossible for small competitors to challenge industry standards coming out of the FSAC.

131.   Defendants' control of the FSAC in tandem with their influential positions in IFRA and RIFM cement Defendant's ability to dictate safety, health, and industry standards in the Fragrance market.

132.   Defendants also had significant opportunities to collude at other industry events, including those thrown by the American Society of Perfumers.  For instance, at the American Society of Perfumers' golf event, pictures show executives from Firmenich, Givaudan, and IFF paired in groups together.  And pictures from the American Society of Perfumers' Symposium similarly show Firmenich and IFF executives posing with their arms around each other.  These examples illustrate the coziness of executives from different fragrance companies as well as the many

---

[110] *Id.*

opportunities those executives had to collude and share competitively sensitive information with one another.

133.   Defendants also participate in the reoccurring World Perfumery Congress. Givaudan, IFF, and Firmenich are Diamond Sponsors of the 2024 conference while Symrise is a Platinum Sponsor.[111]   The self-described "Sensory Event for Fragrance Leaders" is a multiday conference where industry insiders meet to listen to presentations and attend networking receptions. The presentations for the 2024 event include "The Current State of Fragrance According to Industry Insiders" and "The Future of Fragrance Stewardship."[112]

134.   On information and belief, by controlling the trade associations in the fragrance market, Defendants used the trade association meetings as forums to exchange competitively sensitive pricing and volume information and organize their cartel.  As detailed above, these exchanges of information are confirmed by IFF's admission on February 10, 2022, that it knew how an "awful lot of [its] competitors" were pricing their products.[113] The reciprocal sharing of firm-specific competitively

---

[111]   WORLD PERFUMERY CONGRESS, https://worldperfumerycongress.com/ (last accessed Feb. 4, 2024).

[112]   *All Sessions*, WORLD PERFUMERY CONGRESS, https://wpc2024.mapyourshow.com/8_0/explore/session-fulllist.cfm#/ (last accessed Feb. 4, 2024).

[113] International Flavors & Fragrances Inc. (IFF) CEO Andreas Fibig on Q4 2021 results - Earnings Call Transcript, https://seekingalpha.com/article/4486003-

sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[114]

## C.   Defendants Coordinated Price Increases During the Class Period

135.   Defendants acted in concert to fix, raise, maintain, and stabilize the price of Fragrances manufactured, sold, distributed, or imported into the United States. This unlawful agreement in restraint of trade began at least as early as January 1, 2018, and continues into the present. Defendants' conduct constitutes a horizontal price-fixing conspiracy and violates Sections 1 and 3 of the Sherman Act, state antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of the several States and District of Columbia.

136.   During the period prior to the alleged conspiracy, fragrance prices in the United States were in a steady decline. The beginning of the conspiracy marked a period of flat prices followed by a dramatic increase by over 37%.[115]

137.   Since at least 2018, Defendants have coordinated price increases to increase their profits.  The justifications offered by Defendants—that their price

---

international-flavors-and-fragrances-inc-iff-ceo-andreas-fibig-on-q4-2021-results-earnings.

[114] William E. Kovacic et al, *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393 (2011).

[115] United States Bureau of Labor Statistics, *Producer Price Index by Commodity: Chemicals and Allied Products: Synthetic Organic Chemicals for Use as Flavor and Perfume Materials*, FRED, https://fred.stlouisfed.org/series/WPU061403997 (last accessed Feb. 1, 2024).

increases were due primarily to increased input costs, chiefly stemming from the pandemic—were pretextual and could not fully account for the significant increases in prices over the Class Period. These price increases are not adequately explained by market factors. Moreover, Defendants publicly signaled their intent to raise prices throughout the Class Period, providing one another with assurances that they would not compete for business on price.

138.   In a competitive market, increasing prices should result in customer churn, loss of sales volume, and loss of profits.  Contrary to these basic economic principles, Defendants have repeatedly touted their ability to raise Fragrance and Fragrance Ingredient prices during the Class Period without any negative impact on their fragrance businesses.  Such circumstances further confirm both that Defendants have engaged in price fixing and that they were successful in doing so.

139.   Publicly available information shows that Defendants suspiciously reported increasing prices around the same time on several occasions throughout the Class Period.  For example, in January 2018, Givaudan announced that it was raising prices on all products by 6% effective in February 2018.

140.   In an April 9, 2018 report on its first-quarter sales, Givaudan reported that it "continues to implement price increases in collaboration with its customers to

compensate for the increases in input costs."[116] Likewise, Symrise reported in its

first-quarter 2018 earnings call that "we continue to implement price increases in

close dialogue with our customers to compensate for higher raw material cost.[117]

141.   In an August 7, 2018 SEC report, IFF disclosed that its "[n]et sales

during the second quarter of 2018 increased 9%," due in part to "price increases"

during the period.[118]

142.   On August 14, 2018, Symrise reported price increases in its Fragrance

segment through a press release, announcing that "the company is in close dialogue

with its customers to actively implement price increases."[119]

143.   Less than one month later, on September 6, 2018, IFF then-CEO

Andreas Fibig also announced that their "teams are out there and ***increasing prices***

***as much as they can***."[120]

---

[116]   *First Quarter Sales*, GIVAUDAN (Apr. 9, 2018), https://www.givaudan.com/media/media-releases/2018/2018-first-quarter-sales.

[117] Olaf Klinger, CFO & Member of Executive Board for Symrise AG, Remarks at Q1 2018 Symrise AG Earnings Call – Final (May 8, 2018) (Transcript available in Westlaw).

[118] International Flavors & Fragrances, Inc., Quarterly Report (Form 10-Q), at 26 (Aug. 7, 2018).

[119] *Strong Organic Growth of 9.0% in the First Half of 2018*, SYMRISE (Aug. 14, 2018), https://www.symrise.com/newsroom/article/strong-organic-growth-of-90-in-the-first-half-of-2018/.

[120] International Flavor & Fragrances Inc. at Barclays Global Consumer Staples Conference. Boston. September 18, 2018. (Thomson StreetEvents)- Edited Transcript of International Flavor & Fragrances Inc. presentation Thursday,

144.   Shortly after, on October 8, 2018, Givaudan confirmed that "the company continues to implement price increases in collaboration with its customers to compensate for the increases in input costs."[121]

145.   A few months later, during a January 25, 2019 investor call, Givaudan announced that the company was "working on price increases" for fragrances and that Givaudan was very "confident to pass on, let's say, the lion's share of the price increase for the combined 5%, 6% for both divisions in 2019, and there will be a, let's say, a relatively small tail end in 2020."[122]

146.   Coming full circle, on February 19, 2019, IFF's VP of Global Communications and Investor Relations, Michael Deveau, announced that IFF was looking to achieve "about a 4% price increase related to the scent" business.[123]

147.   Defendants continued touting their price increases throughout 2019.

---

September 6, 2018 at 3:15:00pm GMT, https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Barclays-Global-Consumer-Staples-Co-37949946/ (emphasis added).

[121] *2018 Nine Month Sales*, GIVAUDAN (Oct. 8, 2018), https://www.givaudan.com/media/media-releases/2018/2018-nine-month-sales.

[122] *Givaudan's (GVDBF) CEO Gilles Andrier on Q4 2018 Results*, SEEKING ALPHA (Jan. 25, 2019), https://seekingalpha.com/article/4235672-givaudans-gvdbf-ceo-gilles-andrier-on-q4-2018-results-earnings-call-transcript.

[123] International Flavor & Fragrances Inc. at Consumer Analyst Group of New York Conference Transcript, https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-CAGNY-2019-Conference-Feb-19-2019-37937566/.

148.   On July 18, 2019, Givaudan's CEO, Gilles Andrier, announced that, with respect to managing raw material cost increases, "we are fully compensated with price increase."[124]   In other words, Givaudan was able to recoup all costs in connection with increases in the costs of raw material through price increases.   On August 10, 2019, Symrise's CFO, Olaf Klinger, reported that Symrise was "successful in getting through those price increases"[125] in the fragrance segment and, during a September 2019 CEO conference, IFF's then-CEO Fibig touted that IFF had "seen in the last couple of quarters a mid-single-digit growth on the scent business, which was probably driven by – half of its volume growth, half of its price growth," which demonstrates that IFF has been increasing prices since at least sometime in 2019 without repercussions.[126]

---

[124] *Givaudan SA (GVDBF) CEO Gilles Andrier on Q2 2019 Results - Earnings Call Transcript*, SEEKING ALPHA (July 18, 2019) https://seekingalpha.com/article/4275832-givaudan-sa-gvdbf-ceo-gilles-andrier-on-q2-2019-results-earnings-call-transcript.

[125] *Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on Q2 2019 Results - Earnings Call Transcript*, SEEKING ALPHA (Aug. 10, 2019), https://seekingalpha.com/article/4284389-symrise-ag-syief-ceo-heinz-jurgen-bertram-on-q2-2019-results-earnings-call-transcript.

[126] *International Flavors & Fragrances Inc. at Sanford C Bernstein Strategic Decisions CEO Conference Transcript*, MARKETSCREENER (September 25, 2019) https://www.marketscreener.com/quote/stock/INTERNATIONAL-FLAVORS-F-13047/news/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Bernstein-16th-Annual-Strategic-Dec-37916407/.

981296.1

149.   Touting Symrise's strong fourth quarter 2019 performance, Klinger reported that "[i]n 2019, [Symrise's] profitability grew stronger than the top line, mainly due to under-proportional raw material price increases and good cost management."[127] In the same call, CEO Heinz-Jürgen Bertam explained that "[r]aw material prices change and change all the time. As we use 10,000 raw materials typically…most of this levels out…a lot of these effects level themselves out."[128]

150.   Defendants increased prices again in 2020.  At Givaudan's July 21, 2020 earnings call, Givaudan CEO Andrier was asked how much of the company's 1% gross profit margin improvement was due to raw material costs. Andrier responded that raw material costs "had no material effect on the gross profit margin to explain the 1% improvement."[129]  Rather, the "improvement has lot to do with the price increase[s] that we have made."[130] Andrier reported that despite COVID-

---

[127] *Symrise AG Q4 2019 Results: Earnings Call Transcript*, SEEKING ALPHA (Mar. 10, 2020), https://seekingalpha.com/article/4331042-symrise-ag-syief-ceo-heinz-jurgen-bertram-on-q4-2019-results-earnings-call-transcript.

[128] *Id.*

[129] *Givaudan SA (GVDBF) CEO Gilles Andrier on Q2 2020 Results - Earnings Call Transcript*, SEEKING ALPHA (July 21, 2020), https://seekingalpha.com/article/4359705-givaudan-sa-gvdbf-ceo-gilles-andrier-on-q2-2020-results-earnings-call-transcript.

[130] *Id.*

related setbacks, "on a like-for-like basis, our Fragrance division grew 4.5% and our Flavours [*sic*] division grew 3.6%."[131]

151.   Less than a month later, on August 11, 2020, during its 2020 earnings results call, Firmenich's CEO, Gilbert Ghostine, reported that "in consumer fragrance, we grew our revenue by 6%."[132]   CFO Eric Nicolas attributed the company's (overall) increase in profitability to "successful pricing, as well as the favourable [*sic*] impact of raw material costs."[133]

152.   Similarly, in reporting Symrise's 2020 financial results on March 9, 2021, Klinger boasted that "[i]n Scent & Care, 40% of the organic growth and pricing and 60% was volume related."[134]

153.   And, consistent with 2019 and 2020, Defendants hiked prices again in 2021.  For example, on November 9, 2021, IFF's then-CEO Fibig reported that the company's fragrance division has had a "strong year" in part because of a "sales profitability expansion of 110 basis points" that had been "led by higher volume,

---

[131] *Id.*

[132] 2020 Firmenich Earnings Results Call Transcript (Aug. 11, 2020).

[133] *Id*.

[134] *Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on 2020 Financial Results – Earnings Call Transcript*, SEEING ALPHA (Mar. 9, 2021), https://seekingalpha.com/article/4412605-symrise-ag-syief-ceo-heinz-jurgen-bertram-on-2020-financial-results-earnings-call-transcript.

favorable mix and higher productivity."[135]  Fibig then stated that "[o]ur team . . . did an exceptional job increasing prices to combat inflationary pressures, something that will continue to be critical as we move forward."[136]  On the same earnings call, CFO Glenn Richter confirmed that IFF implemented "broad-based pricing actions across all of our businesses."[137]

154.   During an earrings call, Firmenich's Ghostine announced that for the six months ending December 31, 2021, Firmenich's "revenue grew by 12%" and "we increased our adjusted EBITDA by 25%."[138]  Firmenich achieved this solid revenue and profitability growth by increasing prices.  As Ghostine stated, "we are making all the action in order to make sure that we pass [the higher cost] to our customers."[139]

155.   Symrise also confirmed 2021 price increases during an earnings call held on March 1, 2022, in which Symrise's new CEO, Dr. Heinz-Jürgen Bertram,

---

[135] *Q3 2021 International Flavors & Fragrances Inc. Earning Call Transcript*, THE MOTLEY FOOL (Nov. 9, 2021), https://www.fool.com/earnings/call-transcripts/2021/11/09/international-flavors-fragrances-inc-iff-q3-2021-e/.

[136] *Id.*

[137] *Id.*

[138] *Firmenich Half Year 2022 Results Presentation Transcript*, https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B0e7a45ec-10c3-4ec4-b4a9-4d85bdd25d97%7D_Firmenich_HY22_Presentation_Script.pdf.

[139] *Id.*

reported that "price increase initiatives were taken early on in the second half of last year" in its Fragrance business.[140]

156.   After several years of steady price increases, on March 17, 2022, IFF again announced price increases that affected its Fragrance business.[141]

157.   Less than one month later, on April 12, 2022, Givaudan announced that it would keep raising prices in 2022, purportedly to offset higher input costs, despite the fact that like-for-like sales rose 4.6% in the first quarter.[142]

158.   In a May 10, 2022 earnings call, IFF noted that it had raised prices by approximately 8% in the preceding quarter.[143]   When asked by an analyst whether the steep price increases were leading to push back from customers, Franklin Clyburn, IFF Chief Executive Officer stated:

---

[140] *Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on Q4 2021 Results - Earnings Call Transcript*, SEEKING ALPHA (Mar. 4, 2022), https://seekingalpha.com/article/4492962-symrise-ag-syief-ceo-dr-heinz-jurgen-bertram-on-q4-2021-results-earnings-call-transcript.

[141] *IFF Announces Global Price Increases Across All Divisions*, IFF (Mar. 17, 2022), https://ir.iff.com/news-releases/news-release-details/iff-announces-global-price-increases-across-all-divisions.

[142] *Givaudan to Keep Raising Prices After Q1 Sales Grew 4.6%*, REUTERS (Apr. 12, 2022), https://www.reuters.com/business/retail-consumer/givaudan-keep-raising-prices-after-q1-sales-grew-46-2022-04-12/.

[143] *International Flavors & Fragrances Inc. (IFF) Q-1 2022 Earnings Call Transcript*, ALPHA STREET (May 10, 2022), https://news.alphastreet.com/international-flavors-fragrances-inc-iff-q1-2022-earnings-call-transcript/.

There are pushbacks.  I think some of the pushbacks are in some of the smaller customers, some of our emerging market customers where price is much more sensitive.  We are seeing pushback there.[144]

Glenn Robert Richter, Executive Vice President and Chief Financial Officer of IFF elaborated, stating that:

I'd say, first of all, obviously, **we're not unique**.  Every industry is experiencing substantial increases in inflation and **all of our competitors are out there basically taking prices up as well**.[145]

159.   Givaudan announced accelerated price increases again on July 21, 2022, despite the fact that like-for-like sales rose 7.9% year on year in the second quarter.[146]

160.   Shortly thereafter, on August 2, 2022, Symrise announced general price increases (including, apparently for Fragrances) and its CEO, Dr. Bertram, boasted that the company managed to pass on the bulk of the higher costs to customers in the first half of the year.[147]

---

[144] *Id.*

[145] *Id.* (emphasis added).

[146] Silke Koltrowitz, *Givaudan to Accelerate Price Increases as Input Costs Hit Margins*, REUTERS (July 21, 2022), https://www.reuters.com/business/retail-consumer/givaudan-confirms-mid-term-targets-works-pass-higher-prices-2022-07-21/.

[147] Jagoda Darlak & David Latona, *Symrise Hikes Forecast as Higher Prices, Demand Offset Soaring Costs*, REUTERS (Aug. 2, 2022), https://www.reuters.com/business/germanys-symrise-raises-sales-outlook-increased-demand-2022-08-02/.

161.   A few days later, on August 5, 2022, Firmenich's Ghostine likewise announced price increases despite a 32% increase in its fine Fragrance sector.[148] Firmenich's CFO Benoit Fouilland stated "If you look at the mix of our growth, you will see 11% growth that we delivered in financial year '22 . . . 30% of the growth was coming from price . . . As you move towards the second part of the year the contribution of price to the overall growth has been increased."[149] Ghostine also stated that Firmenich had "passed on the vast majority of the cost increase already this year, and [would] continue doing so next year."[150] Firmenich confirmed those continuing price hikes in a November 22, 2022 press release.[151]

---

[148] Jennifer Weil, *Firmenich Posts Record Full-year Top- and Bottom-line Growth*, YAHOO NEWS (Aug. 5, 2022), https://www.yahoo.com/news/firmenich-posts-record-full-top-182010078.html.

[149] *Firmenich Full Year 2022 Results Transcript*, https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B8d3b75af-a4c7-4e3a-ad0f-07828f370537%7D_Firmenich_Full_Year_2022_Results_transcript.pdf?elqTrackId=1137cb7ba0a1478d8368bff3787e7e5c&elqaid=450&elqat=2.

[150] Jennifer Weil, *Firmenich Posts Record Full-year Top- and Bottom-line Growth*, YAHOO NEWS (Aug. 5, 2022), https://www.yahoo.com/news/firmenich-posts-record-full-top-182010078.html.

[151] *Firmenich Delivered Double-Digit Revenue Growth In the First Quarter of Financial Year 2023*, FIRMENICH (Nov. 22, 2022), https://www.bloomberg.com/press-releases/2022-11-22/firmenich-delive230red-double-digit-revenue-growth-in-the-first-quarter-of-financial-year-2023.

162. And, on November 8, 2022, IFF's CFO Glenn Richter boasted to investors that the "Scent division once again delivered a strong performance . . . due to volume growth, out price increases and productivity gains."[152]

163. Defendants have continued to tout their ability to raise Fragrance prices in the last few months. On January 25, 2023, Tom Hallam, Givaudan's CFO, noted to its investors that "price increases" had "partially compensated" for higher Fragrance input costs.[153]

164. Similarly, on February 9, 2023, IFF's Richter indicated that there were price increases in its Scent division.[154] Further, despite volume issues in other parts of the business, IFF's new CEO, Frank Clyburn, noted that "in [IFF's] scent business, we feel as though our [sales] volumes are very comparable to peers and the competitors."[155]

---

[152] *International Flavors & Fragrances Inc. (IFF) Q3 2022 Earnings Call Transcript*, SEEKING ALPHA (Nov. 8, 2022), https://seekingalpha.com/article/4554858-international-flavors-and-fragrances-inc-iff-q3-2022-earnings-call-transcript.

[153] *Givaudan SA (GVDBF) Q4 2022 Earning Call Transcript*, SEEKING ALPHA (Jan. 25, 2023), https://seekingalpha.com/article/4572304-givaudan-sa-gvdbf-q4-2022-earnings-call-transcript.

[154] *International Flavors & Fragrances Inc. (IFF) Q4 2022 Earnings Call Transcript*, SEEKING ALPHA (Feb. 9, 2023), https://seekingalpha.com/article/4576967-international-flavors-and-fragrances-inc-iff-q4-2022-earnings-call-transcript.

[155] *Id.*

981296.1

165.   A week later, on February 16, 2023, Firmenich announced that "we continued to achieve strong momentum, with robust Revenue growth across the [fragrance ingredients] portfolio, supported by strong pricing measures and sustained customer demand" and the company is planning to take "further pricing actions."[156]   On the same day, during the earnings call, Ghostine affirmed the company's ability to increase prices without hurting sales, stating "we are [] able to combine price increases with sustained demand."[157]

166.   A month later, Symrise CEO Klinger reported on the exception 11.4% sales growth. "Unlike normal years when target a sales split of one third pricing and two third volume, '22 was far from normal. We needed to pass through high costs to our customers and…we were to a large extent successful. We achieved around 75% pricing and around 25% volume growth in organic."[158] Defendants' ability to reliably increase prices *and* volume at the same time provides strong circumstantial evidence of their conspiracy.

---

[156] *Firmenich Delivers Strong Results in First Half of Fiscal Year 2023*, FIRMENICH (Feb. 16, 2023), https://www.firmenich.com/company/press-release/firmenich-delivers-strong-results-first-half-fiscal-year-2023.

[157] *Firmenich Half Year 2023 Earnings Call Transcript*, https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B6cd374b9-a455-4446-a591-fa12c5c02f69%7D_Firmenich-Half-Year-2023-Results-Transcript.pdf.

[158] *Symrise CFO Olaf Kinger on Q4 2022 results Earnings Call Transcript*, SEEKING ALPHA (Mar. 8, 2023), https://seekingalpha.com/article/4585801-symrise-ag-syief-q4-2022-earnings-call-transcript.

167.   As alleged above, Defendants implemented consistent price increases throughout the Class Period and were able to do so without losing sales volumes or hurting profitability.   Such price increases—with respect to magnitude and frequency—should not have been possible in a truly competitive market because customers (*i.e.*, Plaintiffs and the Classes) would have taken their business elsewhere in response to rising prices.   Yet, Defendants' conspiracy prevented customers from switching to cheaper alternatives, therefore enabling Defendants to achieve price increases consistently—without loss of sales or profitability—over several years during the Class Period in the midst of difficult economic conditions attributable to the COVID-19 pandemic, supply chain disruptions, and inflation.

## D.   Defendants Monitored Their Conspiracy

168.   Price fixing cartels commonly monitor the conduct of the co-conspirators.   As noted by a Former Deputy Assistant Attorney General, in the Antitrust Division, Gary R. Spratling, who was responsible for investigation and prosecuting international cartels, cartels "have shared a number of common characteristics."[159] On top of agreed-upon and volumes, exchanges of otherwise competitively sensitive information, and prices charged to customers, a common

---

[159] Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, ABA's Criminal Justice Section Presentation "Are the Recent Titanic Fines in Antitrust Case Just the Tip of the Iceberg?" (Mar. 6, 1998).

characteristic among cartels includes "sophisticated mechanisms to monitor and police the agreements."[160]

169.   Defendants monitored their conspiracy through inter-Defendant sales and public statements. IFF's public statements during the Class Period strongly suggest knowledge of each other's sensitive information on pricing and sales volumes, which is also consistent with the existence of Defendants' unlawful agreement to fix prices.  On the February 10, 2022 conference call with investors, then-CEO Fibig confirmed that IFF was tracking competitively sensitive information when he noted that "competitors" were also raising prices and that IFF's price increases were "neck to neck" with IFF's competitors "in the market."[161]  On the same call, Fibig also stated "we actually expect – and what we've seen from an awful lot of our competitors is everybody is basically implementing *the same range of pricing* in the market."[162]  Similarly, Givaudan in its 2022 Integrated Annual Report stated that "[m]onitoring of the competitive landscape" is "[h]ow we mitigate risks."[163]

---

[160] *Id.*

[161] *International Flavors & Fragrances Inc. (IFF) CEO Andreas Fibig on Q4 2021 results - Earnings Call Transcript*, SEEKING ALPHA (Feb. 10, 2022), https://seekingalpha.com/article/4486003-international-flavors-and-fragrances-inc-iff-ceo-andreas-fibig-on-q4-2021-results-earnings.

[162] *Id.* (emphasis added).

[163] *2022 Integrated Annual Report*, GIVAUDAN 24 (January 25, 2023), https://www.givaudan.com/files/giv-2022-integrated-annual-report.pdf.

981296.1

E.      **Defendants' Pretextual Reasons for Their Price Increases**

170.   On information and belief, the justifications offered by Defendants—that their price increases were due to increased input costs—were pretextual and could not fully account for the significant increases in prices over the Class Period.

171.   Defendants' conspiracy appears to have begun in response to increases in the cost of key fragrance inputs, such as petrochemicals, vanilla, and citrus.  In a normal market, when the cost to manufacture increases, it is common for some of those costs to be passed on to customers in the form of higher prices.  In a competitive market, a manufacturer typically cannot pass on to the customer all these costs because if prices increase too much, customers will turn to rival competitors or stop buying altogether.  Apparently, recognizing this fact, Defendants banded together to coordinate raising their prices.  Once Defendants entered into an illegal agreement to fix prices in or around 2018, Defendants continued the cartelized pricing conduct throughout the Class Period despite, as shown before, an easing in the costs of raw materials.

172.   Inflation surrounding the cost of various raw materials began easing in or around 2020.  Yet, Defendants continued to cite raw materials as a pretext for price increases and continued increasing prices.  This shows that Defendants had the collective power to increase prices without fear that a competitor (*i.e.*, one of the co-conspirators) would undercut them—a condition that is unnatural in a competitive

market.  For example, among other instances, IFF disclosed on the November 8, 2022 earnings call, that "while we are clearly seeing signs of raw material inflation easing, we will continue taking appropriate targeted actions to offset inflation to maintain profitability,"[164] suggesting continued price increases even after the prices of raw materials stabilized.  Indeed, on a February 9, 2023 call regarding 2022 Q4 earnings, IFF's Richter confirmed that IFF had implemented price increases (a "catch up in pricing") during the fourth quarter of 2022 in the Scent division.[165]

173.    Similarly, on January 28, 2022, during a 2021 third quarter earnings call, Givaudan's CFO Tom Hallam observed that "the raw mat[erial]s were basically flat over 2021" as evidence that there was no  reason or argument to increase prices that year.[166]  One year later, on January 25, 2023, despite continuous easing in the prices of raw materials, Mr. Hallam revealed that as a result of (and despite) "price

---

[164] *Q3 2022 International Flavors & Fragrances Inc. Earning Call Transcript*, SEEKING ALPHA (Nov. 8, 2022), https://seekingalpha.com/article/4554858-international-flavors-and-fragrances-inc-iff-q3-2022-earnings-call-transcript.

[165] *Q4 2022 International Flavors & Fragrances Inc. Earning Call Transcript*, SEEKING ALPHA (Feb. 9, 2023), https://seekingalpha.com/article/4576967-international-flavors-and-fragrances-inc-iff-q4-2022-earnings-call-transcript.

[166] *Givaudan Q3 2021 Results – Earning Call Transcript*, SEEKING ALPHA (Jan. 28, 2022), https://seekingalpha.com/article/4482632-givaudans-gvdbf-ceo-gilles-andrier-on-q3-2021-results-earnings-call-transcript.

981296.1

increases," sales and profit measures increased, indicating that Givaudan continued to increase prices despite raw material inflation easing.[167]

174.   Likewise, demand factors do not justify Defendants' price increases. Regarding demand, U.S. macroeconomic indicators of demand show that hourly earnings, personal consumption, per capital real GDP, and unemployment all returned to the post-Great Recession trend after recovering from the economic shock of the COVID-19 pandemic as the following chart shows:



---

[167] *Givaudan SA (GVDBF) Q4 2022 Earning Call Transcript*, SEEKING ALPHA (Jan. 25, 2023), https://seekingalpha.com/article/4572304-givaudan-sa-gvdbf-q4-2022-earnings-call-transcript.

78

175.   None of these developments point to demand as a basis for steep price increases for Fragrances and Fragrance Ingredients.

176.   Defendants achieved generally consistent price increases with their customers, including Plaintiffs and the Class, despite such increases being historically difficult to obtain and keep.  Defendants, as a result of collusive price-fixing conduct, achieved these price increases even after the cost of raw materials—the purported reason for price increases—declined or stabilized.

## F.    Defendants' Coordinated Parallel Price Increases Substantially Improved Their Profitability

177.   Despite Defendants' claims that their price increases served only to "offset higher costs,"[168] publicly available data indicate that many of Defendants' earnings before interest, taxes, depreciation, and amortization ("EBITDA") and gross profits increased during the Class Period, in some cases precipitously.

178.   For instance, as shown in the chart below, IFF's EBITDA surged from $160 million in Q4 2017 to $611 million in Q3 2022.[169]  Givaudan's EBITDA,

---

[168] Silke Koltrowitz, *Givaudan to Accelerate Price Increases as Input Costs Hit Margins*, REUTERS (July 21, 2022), https://www.reuters.com/business/retail-consumer/givaudan-confirms-mid-term-targets-works-pass-higher-prices-2022-07-21.

[169] *International Flavors and Fragrances – EBITDA*, TRADING ECONOMICS, https://tradingeconomics.com/iff:us:ebitda (last accessed Feb. 4, 2024).

meanwhile, increased rapidly from $496 million in H2 2017 to $810 million in H1 2022.[170]



Source: tradingeconomics.com

179.    Gross profits at IFF and Givaudan also increased over the Class Period. For IFF, gross profits rose from $356 million in Q4 2017 to $1 billion in Q3 2022.[171]

---

[170]        *Givaudan – EBITDA*, TRADING ECONOMICS, https://tradingeconomics.com/givn:vx:ebitda (last accessed Feb. 4, 2024).

[171] *International Flavors and Fragrances – Gross Profit on Sales*, TRADING ECONOMICS, https://tradingeconomics.com/iff:us:gross-profit-on-sales (last accessed Feb. 4, 2024).

Givaudan's gross profits increased from $1.12 billion in H2 2017 to $1.46 billion in H1 2022.[172]



180.    Givaudan and IFF boasted their ability to record growth while continuously raised prices. In 2018, Givaudan highlighted the fact that "Fragrance Ingredients sales recorded growth, supported by price increases."[173] The next year, they again emphasized that the Fragrance Division obtained "[e]xcellent growth

---

[172]    *Givaudan – Gross Profit on Sales*, TRADING ECONOMICS, https://tradingeconomics.com/givn:vx:gross-profit-on-sales (last accessed Feb. 4, 2024).

[173]    *2018 Full Year Results*, GIVAUDAN (January 25, 2019), https://www.givaudan.com/files/giv-2018-fyr-presentation.pdf.

driven by the strong performance of new wins and price increases to compensate for higher input costs."[174]

181.   In 2018, IFF had its "strongest improvement in Fragrance Ingredients, which grew high-single digits, led by price increases."[175]   In 2023, IFF claimed "profitability driven by favorable net pricing & productivity" and as a result "[d]elivered higher than expected sales and EBITDA in Q3 2023 driven by improved volume, favorable price to inflation & productivity benefits."  Even when IFF saw a dip in sales volume it was able to keep "margin stable as price increases and the benefits of productivity initiatives offset higher raw material costs."[176]

182.   Symrise experienced a similar surge in earnings and profits during the Class Period despite its claims of rising costs, with EBITDA increasing nearly 50% from €631 million in FY 2018 to €922 million in FY 2022.[177]

---

[174]   *2019 Full Year Results*, GIVAUDAN (January 24, 2020), https://www.givaudan.com/files/giv-2019-fyr-presentation.pdf.

[175]   *IFF Q4 & FY 2018 Earnings Conference Call*, IFF (February 14, 2018), https://ir.iff.com/static-files/64efb9a0-b5e8-4aa7-a300-53e4f57de707.

[176]   *Third Quarter 2023 Earnings Conference Call*, IFF (November 7, 2023), https://ir.iff.com/static-files/e26b794e-c037-4a34-9381-e0361d7bf414.

[177]   *Financial Report 2022*, SYMRISE (May 10, 2023), file available at https://www.symrise.com/newsroom/downloads/.

183.    Over the same period, Firmenich's adjusted EBITDA rose from 825.5 CHF to 904.5 CHF, while its unadjusted EBITDA remained flat at around 800 CHF.[178]

184.    These increases in EBITDA and profits during the relevant period are inconsistent with Defendants' pretextual explanation that their price increases merely offset rising costs and are more consistent with the existence of a conspiracy to fix prices.

## G.    Defendants Restrained and Allocated the Supply of Key Fragrance Ingredients

185.    During the Class Period, Defendants restrained the supply of Fragrance Ingredients.  Defendants agreed to each produce only a specific subset of Fragrances and Fragrance Ingredients and not to produce other Fragrances and Fragrance Ingredients produced by their competitors.  By doing so, Defendants ensured that when customers wanted to make a fragrance requiring a specific ingredient, only one or a limited number of Defendants would be able to do so.  This greatly restrained competition in the fragrance industry and allowed Defendants to increase prices above the levels that would otherwise have been set by a competitive market.

---

[178]      *Firmenich      Annual      Report      2022*, FIRMENICH      31, https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B12ed0bb5-85e8-45e3-9d34-e4571c98cc26%7D_220805_FIRMENICH_AR_FY22. pdf.

186.   By reaching this agreement, Defendants were able to nullify the competitive effects of Defendants' ability to reverse-engineer each other's fragrances.   So long as Defendants maintained a significant amount of non-overlapping Fragrance Ingredients, it would not matter if they could reverse-engineer each other's fragrances because they would not have the ingredients to make those fragrances. By agreeing not to produce certain Fragrance Ingredients, that is, Defendants restrained their ability to compete with each other by offering lower prices on specific fragrances.

187.   The plausibility of Defendants' conspiracy has been confirmed by scholars who have studied the fragrance industry.   As one scholar wrote in 2016, "Five multinational corporations, four of which originated in Western Europe, dominate the world fragrance market.   *For years this industrial concentration fostered a tacit agreement among the industry's largest players.   Under this informal understanding, the major fragrance houses would not cannibalize each other by manufacturing competing products based on formulas of a competitor acquired through reverse engineering.*"[179] This author went on to describe this understanding as a "*gentleman's agreement*," a term also used by Calice Becker— head of the International Society of Perfumers-Creators (ISPC), whose members are

---

[179] Charles Cronin, *Lost and Found: Intellectual Property of the Fragrance Industry; From Trade Secret to Trade Dress*, JIPEL (Feb. 2, 2016) (emphasis added), https://jipel.law.nyu.edu/vol-5-no-1-6-cronin/.

predominantly affiliated with Defendants—who has described the industry as characterized by "a sort of gentleman's agreement and unspoken rules."[180]

188.   Similarly, two other scholars have remarked on how the leading fragrance manufacturers have reached a "***non-appropriation consensus***" when it comes to "olfactory creations" (with one of these scholars making this observation in an obscure, non-publicly available French-language source by no later than 2012), and have described the fragrance "industry" as "incestuous."[181]   At some point, this tacit agreement became express.

189.   Indeed, Defendants' own employees and their co-conspirators have entered into public affirmations of this agreement not to compete.  For example, the December 2022 "Perfumery Code of Ethics," authored by a former IFF employee and counting among its signatories current and former employees of Defendants and their co-conspirators, states as its first maxim the following: "We pledge to create or promote original olfactory forms.  Borrowed forms shall have their original creators and formula owners named and rewarded.   ***Plagiarism is not tolerated***."[182] Adherents to the Perfumery Code of Conduct have thus mutually and expressly

---

[180] *Id.*

[181]  Claire Guillemin, LAW & ODEUR: FRAGRANCE PROTECTION IN THE FIELDS OF PERFUMERY AND COSMETICS 25 (1st ed. 2016).

[182]  Perfumery Code of Ethics, v 23/2022-05 (emphasis added), https://perfumeryethics.org/the-code/ (last accessed Feb. 4, 2024).

agreed not to compete with one another over their respective fragrance formulas. Likewise, the ISPC espouses a similar sentiment on its website: "We all copy and steal like artists – it's part of the creative process to understand how masterpieces are created, but what's crucial is to know what we do with the copies. *Have them on the market the way they are - is plagiarism.*"[183]

190.  By only producing a specific subset of Fragrance Ingredients, Defendants ensured that when customers wanted to make a fragrance requiring a specific ingredient, only one or a limited number of Defendants would be able to do so. For example, Symrise touts itself as the "No. 1 supplier of fragrance raw materials," but it lists only 207 Fragrance Ingredients on its website. IFF reports 255. And Firmenich discloses only 206.  Finally, Givaudan lists only 176 Fragrance Ingredients. Each Defendant produces well fewer than the full universe of synthetic and natural Fragrance Ingredients that can be used to make Fragrances. This limited competition in the market for Fragrances and Fragrance Ingredients and, as a result, increased prices.

191.  What is more, Defendants produce *different* Fragrance Ingredients among the subset of Fragrance Ingredients that they produce.  One could imagine an innocent explanation for Defendants producing only a subset of Fragrance

---

[183] *ISPC Speaks at WPC 2022: Three Goals*, PERFUMEURS CREATEURS (Sept. 7, 2022),      https://www.perfumer-creators.com/en/news/ispc-speaks-at-wpc-2022-three-goals-71 (emphasis added).

Ingredients being that certain ingredients are more difficult to produce (or used less) and, therefore, all Defendants produce a similar subset of the overall Fragrance Ingredients.  But that is not the case.  Firmenich, Givaudan, IFF, and Symrise all publish their Fragrance Ingredients online.  Excluding the fragrance ingredients that Defendants have trademarked, each Defendant produces a substantial number of Fragrance Ingredients that the other Defendants do not.  For instance, IFF produces lavonax, khusinil, meth cyclocitrone, and myrcenyl acetate, but neither Givaudan nor Symrise produce any of those ingredients.  Similarly, Givaudan produces methyl octyne carbonate, jasmacyclene, and isopropyl quinoline, but neither IFF nor Symrise produce them (even though they both produce isobutyl quinoline, which is chemically similar but distinct from isopropyl quinoline).  And Symrise produces formyrcenol, dimethyl myrcetone, and ethyl propionate, yet again neither Givaudan nor IFF produce those ingredients.  These are but a few illustrative examples.

192.  Defendants' failure to produce these Fragrance Ingredients is not a result of capacity limitations or capital restrictions.  Defendants are the largest Fragrance Ingredient manufacturers in the world and, as they themselves explain, use "cutting-edge chemistry and biotechnology" to develop their synthetic ingredients in order to launch "distinctive, high-performing products."[184]  Indeed,

---

[184] *Shaping Tomorrow's Signature Fragrances with Science*, GIVAUDAN, https://www.givaudan.com/fragrance-beauty/ingredients/fragrance-molecules (last accessed Feb. 5, 2024).

Givaudan explains that its research centers "synthesise [*sic*] nearly 2,000 new molecules every year," even though "[o]nly a small number of th[em] end up in [Givaudan's] perfumers' palette."[185]   Thus, it is clear that Defendants have the **capability** to produce substantially all of the synthetic and natural Fragrance Ingredients that are used to make Fragrances and would enable them to offer their customers the full array of fragrance options.

193.   This drives prices for Fragrances containing those ingredients (and for the ingredients themselves) above competitive levels.

194.   This explanation also comports with COMCO's statement in the aftermath of the dawn raids that it had reason to believe Defendants had "limited the production of certain fragrances."[186]   COMCO's announcement is further evidence that Defendants agreed to allocate the market to increase prices above competitive levels.

---

[185]   *Shaping Tomorrow's Signature Fragrances with Science*, GIVAUDAN, https://www.givaudan.com/fragrance-beauty/ingredients/fragrance-molecules (last accessed Feb. 4, 2024).

[186] *COMCO Investigates Possible Collusions in the Fragrance Market*, COMCO (Mar. 8, 2023), https://www.weko.admin.ch/weko/en/home/medien/press-releases/nsb-news.msg-id-93502.html.

**H.      Government Authorities Conducted Dawn Raids on Defendants**

195.   On March 7, 2023, the EC announced that it had carried out dawn raids at several suppliers and an industry association in the Fragrances and Fragrance Ingredient industry:

> On 7 March 2023, the European Commission carried out unannounced inspections at the premises of companies and an association active in the fragrance industry in various Member States.   In parallel, the Commission has sent out formal requests for information to several companies active in the same sector.

> The inspections and requests for information concern possible collusion in relation to the supply of fragrances and fragrance ingredients. Fragrances are used in the manufacture of consumer products such as household and personal care products.

> The Commission has concerns that companies and an association in the fragrance industry worldwide may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union).

> The Commission has been in contact with the Antitrust Division of the US Department of Justice, the UK Competition and Markets Authority and the Swiss Competition Commission in relation to this matter and the inspections were conducted in consultation with them.   The Commission officials were accompanied by their counterparts from the national competition authorities of the Member States where the inspections were carried out.[187]

196.   Inspections by the EC are not undertaken casually.   Inspections are typically done by an order of the EC, and the EC must have "reasonable grounds for

---

[187] *Antitrust: Commission Confirms Unannounced Inspections in the Fragrance Sector*, EUROPEAN    COMMISSION    (Mar.    7,    2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_1532.

suspecting an infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."[188]

197.    That same day, the CMA confirmed its participation in the investigation and named Defendants as the subject of that investigation:

> The Competition and Markets Authority (CMA) has reason to suspect anti-competitive behaviour has taken place involving suppliers of fragrances and fragrance ingredients for use in the manufacture of consumer products such as household and personal care products.
>
> The businesses under investigation by the CMA are: Firmenich International SA, Givaudan SA, International Flavours & Fragrances Inc, and Symrise AG.
>
> The CMA has been in contact with the Antitrust Division of the US Department of Justice, the European Commission and the Swiss Competition Commission in relation to this matter, and this investigation has been launched in consultation with them.[189]

---

[188] Case No. T-135/09, *Nexans France SAS v. Comm'n*, 2012 E.C.R. 43, http://curia.europa.eu/juris/document/document_print.jsf?doclang=EN&text=&pageIndex=0&part=1&mode=lst&docid=129701&occ=first&dir=&cid=663482.

[189] *CMA Launches Investigation into Fragrances and Fragrances Ingredients*, CMA (last updated Mar. 8, 2023), https://www.gov.uk/government/news/cma-launches-investigation-into-fragrances-and-fragrance-ingredients.

198.    The next day, COMCO confirmed its involvement in the investigation and provided further details regarding the conduct for which Defendants were under investigation:

> **The Swiss Competition Commission (COMCO) has opened an investigation in the fragrance sector.  There are suspicions that producers have colluded**.
>
> COMCO has indications that several undertakings active in the production of fragrances have violated cartel law.  There are suspicions that these undertakings have coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of certain fragrances.  Fragrances are used in the manufacture of many products, including in particular cosmetics, personal care products, detergents and cleaning products.  The undertakings involved in the investigation are Firmenich International SA (Geneva), Givaudan SA (Geneva), International Flavors & Fragrances Inc. (USA) et Symrise AG (Germany).
>
> Dawn raids were conducted at various locations.  These were carried out in consultation with other competition authorities, namely the European Commission, the US Department of Justice Antitrust Division and the UK Competition and Markets Authority.[190]

199.    IFF, Symrise, Givaudan, and Firmenich have all confirmed that they are subjects of the investigation.[191]

---

[190] *COMCO Investigates Possible Collusions in the Fragrance Market*, COMCO (Mar. 8, 2023), https://www.weko.admin.ch/weko/en/home/medien/press-releases/nsb-news.msg-id-93502.html (emphasis in original).

[191] Patricia Nilsson & Javier Espinoza, *Top Four Fragrance Groups Raided in Co-Ordinated Antitrust Probe*, FINANCIAL TIMES (Mar. 8, 2023), https://www.ft.com/content/ebe2087e-198d-40dd-9615-e090facfb99f.

200.   On March 7, 2023, Givaudan confirmed the investigation in a statement

to Reuters:

> "I can confirm that we are part of an industry-wide investigation by
> European and Swiss authorities.  As a good corporate citizen, Givaudan
> is fully cooperating with the authorities," a spokesperson said.[192]

201.   On March 8, 2023, Symrise released a press release on its website

confirming the investigation:

> On March 7, 2023, EU cartel authorities have contacted Symrise at their
> headquarters in Holzminden.   Together with Swiss, British and
> American authorities, they are investigating possible inadmissible
> agreements in the fragrance and fragrance ingredients sector.  These
> investigations are taking place in parallel at all leading companies in
> the industry.  Symrise is cooperating fully with the authorities.  At
> present, precise details and concrete content on this investigation are
> still pending.[193]

202.   That same day, Firmenich posted a press release to its corporate website

stating:

> Firmenich, the world's largest privately owned perfume and taste
> company confirms that on March 7th, 2023, certain competition
> authorities commenced an industry wide investigation into the
> fragrances sector.  As part thereof, unannounced inspections were
> carried out at its offices in France, Switzerland and the UK.

---

[192] Foo Yun Chee & Oliver Hirt, *EU, UK, Swiss Probe Suspected Fragrance Cartel, Givaudan Confirms Cooperation*, REUTERS (last updated Mar. 7, 2023), https://www.reuters.com/world/europe/eu-antitrust-regulators-raid-companies-association-fragrance-sector-2023-03-07/.

[193] *Investigations by International Cartel Authorities*, SYMRISE (Mar. 8, 2023), https://www.symrise.com/newsroom/article/investigations-by-international-cartel-authorities/.

Unannounced inspections are a preliminary step in anti-trust investigations into suspected infringements of competition rules. This does not mean that the company has engaged in anti-competitive behavior nor does it prejudge the outcome of the investigation itself.

Firmenich is closely monitoring the situation and is fully cooperating with the investigators. The Company is unable to comment further at this stage.[194]

203.   Firmenich also stated in its 2023 Financial Statements, "On March 7, 2023, certain competition authorities commenced an industry-wide investigation into the fragrances sector. As part thereof, unannounced inspections were carried out at the Firmenich offices in France, Switzerland and the UK and Firmenich received a subpoena from the Antitrust Division of the United States Department of Justice."[195]

204.   In a May 10, 2023 SEC filing, IFF acknowledged the investigation and disclosed that it had received a subpoena from the U.S. Department of Justice:

On March 7, 2023, the European Commission ("EC") and the United Kingdom Competition and Markets Authority ("CMA") carried out unannounced inspections of certain of IFF's facilities. On the same day, IFF was served with a grand jury subpoena by the Antitrust Division of the U.S. Department of Justice ("DOJ"). IFF understands the EC, CMA, DOJ and the Swiss Competition Commission to be

---

[194] *Firmenich Confirms Anti-Trust Probes into Fragrances Sector*, FIRMENICH (Mar. 8, 2023), https://www.firmenich.com/company/press-release/firmenich-confirms-anti-trust-probes-fragrances-sector.

[195] *Financial statements 2023: for the year ended June 30, 2023*, FIRMENICH, 48 (July 31, 2023), https://www.dsm-firmenich.com/content/dam/dsm-firmenich/corporate/documents/firmenich-sa-annual-report-fy2023.pdf.

investigating potential anticompetitive conduct as it relates to IFF's fragrance businesses.[196]

205.   In an article published March 8, 2023, a spokesperson for IFF told Bloomberg that "they were working closely with the relevant authorities."[197]

206.   The subpoena in question was issued by a criminal grand jury.  This indicates that the DOJ is considering a criminal prosecution against IFF and/or its co-conspirators, as reflected in Chapter 3 of the 2015 edition of the DOJ's Antitrust Division Manual. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed ***with a criminal prosecution***."[198]  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the

---

[196] International Flavors & Fragrances, Inc., Quarterly Report (Form 10-Q), at 25 (May 10, 2023).

[197] Stephanie Bodoni & Lisa Pham, *Fragrance Firms Hit in Europe Suspected of Scent Supply Cartel*, BLOOMBERG (Mar. 8, 2023), https://www.bloomberg.com/news/articles/2023-03-08/fragrance-firms-hit-in-europe-suspected-of-scent-supply-cartel#xj4y7vzkg.

[198] U.S. Dep't of Just., Antitrust Division Manual, Chapter III § F1, at 82, (5th ed., Last Updated April 2015), https://www.justice.gov/sites/default/files/atr/legacy/2015/05/13/chapter3.pdf (emphasis added).

Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are listed for all attorneys general who will participate in the grand jury investigation."[199]  Further, "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district where the price-fixed sales were made or where conspiratorial communications occurred."[200]

207.   On January 11, 2024, IFF announced that its Chief Executive Officer and Director, Franklin K. Clyburn, Jr., would cease to serve as CEO and a director of the Board, effective February 6, 2024.  Clyburn's Separation Agreement with IFF requires him to acknowledge that IFF is "involved in various proceedings launched in March 2023 by certain competition and enforcement authorities in the United States, United Kingdom, Switzerland and before the EU Commission . . . and . . . may be involved in other procedures conducted by other competition or enforcement authorities  .  .  .  in  other  jurisdictions  for  similar  facts. (together,  the 'Investigation')."[201]  Under his Separation Agreement, Clyburn has to "fully and promptly cooperate in good faith with the Company, the Group Companies and their legal counsel in any matter concerning the Investigation" and "in connection with any claim or court action brought against the Company or any Group Company in

---

[199] *Id.* at 83.

[200] *Id.*

[201] International Flavors & Fragrances Inc., Current Report (Form 8-K Filing), Exhibit 10.1, Separation Agreement and General Release (January 11, 2024).

whole or in part for any alleged violation of the antitrust laws ("Derivative Actions"), including, but not limited to, providing testimony at trial or deposition, in compliance with applicable laws."[202]

208.   On top of having to cooperate with IFF, Clyburn's Separation Agreement prohibits him from cooperating with claimants against IFF related to its anticompetitive conduct.  Clyburn has held his post with IFF since January 18, 2022.

209.   Further demonstrating that Defendants commitment to coordination rather than competition, the CMA is investigating Defendants Firmenich, IFF, and Givaudan for entering into "No Poach" agreements concerning their employees. Specifically, the CMA revealed that it was investigating "unlawful coordination by Firmenich International SA, Givaudan SA and International Flavours & Fragrances Inc involving reciprocal arrangements relating to the hiring or recruitment of certain staff involved in the supply of fragrances and/or fragrance ingredients."[203]

---

[202] *Id*.

[203] *Suspected anti-competitive conduct in relation to fragrances and fragrance ingredients (51257)*, CMA (updated January 17, 2024), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-fragrances-and-fragrance-ingredients-51257.

I.     **Defendants Have Injured Plaintiffs and the Class Members as a Result of Their Unlawful Restraint of Trade**

210.   Plaintiffs and Class Members purchase Fragrances other than directly from Defendants through SMEs, wholesalers, and distributors. Some of these distributors have direct relationships with Defendants. For example:

a)  The John D. Walsh Company identifies itself as the North American Distributor for IFF.[204]

b)  Vigon International operates as a fragrance warehouse and distributor and has strategic partnerships with Givaudan, DSM-Firmenich, and Symrise.[205]

211.   Because Defendants have artificially inflated the price of Fragrances, the price of distributor goods has correspondingly increased. As such, Defendants' artificially inflated prices were passed through and absorbed by Plaintiffs and the Classes, causing them damages.

212.   As summarized by Professor John Connor of Purdue University and the American Antitrust Institute, part or all of the overcharge contained in the direct purchase will be passed on to indirect purchasers: "Direct purchasers from an effective sellers' cartel are the immediate losers. However, if the cartel is comprised

---

[204]  *About Us*, The John D. Walsh Company, Inc., https://www.johndwalsh.com/about-us/ (last visited Feb. 4, 2024).

[205] *Our Partners*, Vigon, https://www.vigon.com/our-partners/ (last visited Feb. 4, 2024).

981296.1

of manufacturers…then other buyers farther down the distribution channel are also harmed."[206]

213.   While the specific percentage of overcharge passed through to indirect purchasers is a fact-specific question in each case, the American Bar Association's publication on antitrust damages states that "at least some of the overcharge will be passed on by the direct purchaser to the indirect purchaser(s) in the form of a higher price for the good."[207]

214.   While indirect purchasers may attempt to switch to a different supplier or Fragrance product if prices increase, the price increases resulting from Defendants' unlawful conspiracy have affected an extremely significant portion of the market. As such, cost increases cannot simply be avoided by switching products or suppliers.

215.   Economic theory indicates that the percentage of a given cost increase passed through by a firm to its customers depends on the competitiveness of the relevant industry.[208] In markets that are highly condensed and consolidated, such as

---

[206] John Connor, *Cartel Overcharges*, 26 RESEARCH IN L. & ECON. 249, 256 (2014).

[207] American Bar Association, Antitrust Section, *Proving Antitrust Damages*, 3rd ed., Section 8.

[208] Robert Ritz, *Oligopolistic Competition and Welfare*, HANDBOOK OF GAME THEORY AND INDUSTRIAL ORGANIZATION, edited by Luis Corchon and Marco Marini (2018).

the manufacture and distribution of Fragrance Ingredients, profit margins are small, rendering input cost absorption untenable.

216.   The aforementioned allegations show that the Fragrance market is highly consolidated and condensed. Therefore, pass through rates would likewise be high.

217.   As indirect purchasers of Fragrances, Plaintiffs and Class Members have absorbed the majority of the share of cost increases stemming from Defendants' price-fixing conspiracy.

218.   Due to Defendants' violations of the antitrust laws alleged herein, Plaintiffs and the Classes have sustained injury to their businesses or property, having paid higher prices for Fragrances than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## V.   <u>INTERSTATE TRADE AND COMMERCE</u>

219.   Billions of dollars of transactions in Fragrances and Fragrance Ingredients are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

981296.1

220.   Defendants' manipulation of the market had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

221.   Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for Fragrances and Fragrance Ingredients.

222.   Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories.   Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of Fragrances and Fragrance Ingredients, the prices of Fragrances and Fragrance Ingredients would have been determined by a competitive, efficient market.

## VI.   ANTITRUST INJURY

223.   Defendants' antitrust conspiracy had the following effects, among others:

  a) Price competition has been restrained or eliminated with respect to the pricing of Fragrances and Fragrance Ingredients;

  b) The prices of Fragrances and Fragrance Ingredients have been fixed, raised, maintained, or stabilized at artificially inflated levels;

  c) Purchasers of Fragrances and Fragrance Ingredients have been deprived of the benefits of free and open competition; and

d) Purchasers of Fragrances and Fragrance Ingredients paid artificially inflated prices.

224.   The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and/or maintain the price of Fragrances and Fragrance Ingredients.

225.   The precise amount of the overcharge impacting the prices of Fragrances and Fragrance Ingredients paid by Plaintiffs and the Classes can be measured and quantified using well-accepted models.

226.   By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Fragrances and Fragrance Ingredients than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.   DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY

227. Plaintiffs and the Classes had no knowledge of Defendants' anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, March 7, 2023, when the EC announced its investigation into Defendants and that it was coordinating with the

DOJ, COMCO, and CMA.  As a result, Plaintiffs and the Classes did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before these revelations.  Prior to that time, there was insufficient information to suggest that Defendants were involved in a conspiracy to fix prices, rig bids, or allocate the Fragrance and Fragrance Ingredient market.  Because Plaintiffs could not and did not discover the existence of their claims prior to March 7, 2023, Plaintiffs' claims did not accrue until that date at the earliest.

228.  Moreover, the statute of limitation on the claims asserted herein was tolled by fraudulent concealment until at least March 7, 2023.  Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the beginning of the Class Period.

229.  Defendants' conspiracy was inherently self-concealing.  The success of the conspiracy depended on Defendants and their co-conspirators keeping the price-fixing and bid-rigging conduct alleged herein secret from customers and government authorities.   Accordingly, Plaintiffs reasonably believed they were making Fragrance and Fragrance Ingredient purchases in a competitive industry.

230.  Defendants and their co-conspirators also took affirmative steps to conceal the conspiracy and carry it out in a manner that would evade detection. Throughout the Class Period, Defendants and their co-conspirators effectively,

affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the Classes.   Additionally, Defendants provided pretextual reasons for their price increases that Plaintiffs and the Classes reasonably relied upon.

231.   Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiffs and the Classes did not learn or discover the operative facts giving rise to their claims until March 7, 2023.

232.   Plaintiffs exercised reasonable diligence.   Plaintiffs and the members of the Classes could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.   No information, actual or constructive, was ever made available to Plaintiffs and the Classes that would have led a reasonably diligent person to investigate whether a conspiracy in the market for Fragrances and Fragrance Ingredients existed prior to March 7, 2023.[209]   Plaintiffs and the members of the Classes did not discover and could not have discovered through the exercise of

---

[209] Indeed, this is further bolstered by the fact that the CMA only announced on January 17, 2024 that it had extended its probe of Givaudan, Firmenich, and IFF to include allegations that they engaged in further anticompetitive behavior in the form of so-called no-poach agreements, i.e., unlawful coordination involving reciprocal arrangements relating to the hiring or recruitment of certain staff involved in the supply of Fragrances and/or Fragrance Ingredients.

981296.1

reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.

233.   By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

234.   Plaintiffs' claims are also timely under the continuing violations doctrine.  Each sale by Defendants at prices affected by the conspiracy constituted a new overt act causing injury to Plaintiffs and members of the Classes.

## VIII.  <u>CLASS ACTION ALLEGATIONS</u>

235.   Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b)(2) seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> **<u>Nationwide Class:</u>** All persons or entities who purchased Fragrances or Fragrance Ingredients other than directly from Defendants or alleged co-conspirators for incorporation in a Finished Fragrance Product, where the person or entity purchased in the United States during the Class Period.

236.   Plaintiffs also brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking

damages pursuant to antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following Class (the "Damages Class"):

> **<u>Damages Class:</u>** All persons or entities who purchased Fragrances or Fragrance Ingredients other than directly from Defendants or alleged co-conspirators for incorporation in a Finished Fragrance Product, where the person or entity purchased in an Indirect Purchaser State[210] during the Class Period.

237.   The Nationwide Class and Damages Class are referred to collectively as the "Classes" unless otherwise indicated. Specifically excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, co-conspirators, federal government entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, the Court, and persons who purchased Fragrances or Fragrance Ingredients directly from Defendants.

238.   While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in the Classes. Joinder is therefore impracticable.

---

[210] The "Indirect Purchaser States" are the states listed in Counts Two, Three, and Four.

239.   Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Fragrances and Fragrance Ingredients sold in the United States;

b) The identity of the participants of the alleged conspiracy;

c) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d) Whether the alleged conspiracy violated federal antitrust laws and/or state antitrust, unfair competition, and/or consumer protection laws, as alleged in the following Claims for Relief;

e) Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the Classes, thereby entitling Plaintiffs and Class Members to disgorgement of all benefits derived by Defendants, as alleged in the following Claims for Relief;

981296.1

f)  Whether the conduct of Defendants and their co-conspirators, as alleged in this Consolidated Complaint, caused injury to the business or property of Plaintiffs and Class Members;

g)  The effect of the alleged conspiracy on the prices of Fragrances sold in the United States during the Class Period;

h)  Whether Plaintiffs and the Class Members had any reason to know or suspect the conspiracy, or any means to discovery the conspiracy;

i)  Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and Class Members; and

j)  The appropriate class-wide measure of damages for the Class.

240.  Plaintiffs' claims are typical of the claims of Class Members, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all Class Members are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Fragrances purchased other than directly from Defendants or their co-conspirators.

241.  Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

242.   The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

243.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single form simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

244.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## IX.   CLAIMS FOR RELIEF

### COUNT 1: VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT
### (15 U.S.C. §§ 1, 3)
### (On Behalf of the Nationwide Class for Injunctive and Equitable Relief)

245.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

246.   Defendants are direct competitors in the Fragrance market throughout the United States.

247.   Beginning at least as early as January 1, 2018 and continuing through the present, Defendants entered into a continuing contract, combination, and/or conspiracy, either express or tacit, with respect to the sale of Fragrances and Fragrance Ingredients in unreasonable restraint of trade and commerce and in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3).

248.   The contract, combination, and/or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for Fragrances and Fragrance Ingredients in the United States and elsewhere.

249.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

981296.1

a) Exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of Fragrances and Fragrance Ingredients in the United States and elsewhere;

b) Dividing the market by allocating certain customers to certain Defendants;

c) Imposing supply constraints for Fragrances and Fragrance Ingredients;

d) Participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Fragrances at certain levels, and otherwise to fix, increase, inflate, maintain, and/or stabilize effective prices paid by Plaintiffs and Class Members, including by allocating customers and restraining supply among other things, with respect to Fragrances and Fragrance Ingredients in the United States, including via market allocation; and

e) Participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and enforce the unlawful agreements they reached.

110

250.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices with respect to Fragrances.

251.    Defendants' anticompetitive acts described above were knowing, willful, and constitute a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) and were an unreasonable and unlawful restraint of trade.

252.    Defendants' conspiracy had the following effects, among others:

a) Price competition in the market for Fragrances and Fragrance Ingredients has been restrained, suppressed, and/or eliminated;

b) Prices for Fragrances and Fragrance Ingredients have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and elsewhere; and

c) Plaintiffs and members of the Class who purchased Fragrances and Fragrance Ingredients from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

253.    The alleged contract, combination, or conspiracy is a *per se* violation of the antitrust laws.

254.    The injury to Plaintiffs and Classes is of the type that antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.

981296.1

255.   Plaintiffs and members of the Classes have been injured and will continue to be injured in their business and property by paying more for Fragrances and Fragrance Ingredients purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

256.   Plaintiffs and Classes are threatened with future injury to their business and property by reason of Defendants' continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3).

257.   Plaintiffs and Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### COUNT 2: VIOLATION OF THE STATE AND D.C. ANTITRUST STATUTES
### (On Behalf of Plaintiffs and the Damages Class)

258.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

259.   During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of Fragrances and Fragrance Ingredients in unreasonable restraint of trade in commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

260.   Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Fragrances and Fragrance Ingredients.

981296.1

261.  As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated Indirect Purchasers in the Damages Class who purchased Fragrances and Fragrance Ingredients have been harmed by being forced to pay artificially inflated, supracompetitive prices for Fragrances and Fragrance Ingredients.

262.  By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws pleaded below.

263.  **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Ariz. Rev. Stat. § 44-1402, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Arizona by Class members and/or purchases by Arizona residents.

a) Defendants' combination or conspiracy had the following effects:

(1) Fragrances price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Fragrance prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

113

b) During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1402, *et seq.*

264.  **California**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Cal. Bus. Prof. Code § 16720, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in California by Class members and/or purchases by California residents.

a) During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of § 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of Fragrances at supracompetitive levels.

b) The aforesaid violations of § 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Fragrances.

c) For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) fixing, raising, stabilizing, and pegging the price of Fragrances.

d) The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition in the sale of Fragrances has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Fragrances sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased Fragrances other than directly from Defendants have been deprived of the benefit of free and open competition.

981296.1

e) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property in that they paid more for Fragrances than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of § 16720 of the California Business and Professions Code, members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to § 16750(a) of the California Business and Professions Code.

265. **Colorado**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Colo. Rev. Stat. § 6-4-104, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Colorado by Class members and/or purchases by Colorado residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Colorado; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the

Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Colo. Code Regs. § 6-4-104, *et seq*. Accordingly, members of the Damages Class seek all forms of relief available under Colo. Code Regs. § 6-4-104, *et seq*.

266. **Connecticut**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Conn. Gen. Stat. Ann. § 35-26, *et seq*.** with respect to purchases of Fragrances and Fragrance Ingredients in Connecticut by Class members and/or purchases by Connecticut residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout Connecticut; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. Ann. § 35-26, *et seq*. Accordingly, members of the Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. § 35-26, *et seq*.

267. **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **D.C. Code Ann. § 28-4502, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in the District of Columbia by Class members and/or purchases by District of Columbia residents.

a) Defendants' combination or conspiracy had the following effects:

(1) Fragrance price competition was restrained, suppressed, and

eliminated throughout the District of Columbia; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. § 28-4502, *et seq*. Accordingly, members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4502 *et seq*.

268. **Hawaii:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Haw. Rev. Stat. § 480-1, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Hawaii by Class member and/or purchases by Hawaii residents.

981296.1

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Haw. Rev. Stat. § 480-1, *et seq*. Accordingly, members of the Damages Class seek all forms of relief available under Haw. Rev. Stat. § 480-1, *et seq.*

269. **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **740 Ill. Comp. Stat. Ann. § 10/1, *et seq*.** with respect to purchases of Fragrances and Fragrance Ingredients in Illinois by Class Members and/or purchases by Illinois residents.

981296.1

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. § 10/1, *et seq*. Accordingly, members of the Damages Class seek all forms of relief available under 740 Ill. Comp. Stat. Ann. § 10/1, *et seq*.

270. **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Iowa Code § 553.4, *et seq.*** with respect to purchases of

Fragrances and Fragrance Ingredients in Iowa by Class Members and/or purchases by Iowa residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.4, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under Iowa Code § 553.4, *et seq.*

271. **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Kan. Stat. Ann. § 50-101, *et seq.*** with respect to

981296.1

purchases of Fragrances and Fragrance Ingredients in Kansas by Class members and/or purchases by Kansas residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

981296.1

272. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Me. Rev. Stat. Ann. tit. 10 § 1101,** *et seq.* with respect to purchases of Fragrances and Fragrance Ingredients by Class members and/or purchases by Maine residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Maine; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101, *et seq*. Accordingly, members of the Damages Class

seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1101, *et seq.*

273.  **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Mich. Comp. Laws Ann. § 445.772, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Michigan by Class members and/or purchases by Michigan residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Fragrance prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c) As a direct and proximate result of Defendants' conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreement in restraint of trade in violation of Michigan Comp. Laws Ann. §

445.772, *et seq*. Accordingly, members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.772, *et seq*.

274. **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Minn. Stat. § 325D.51, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Minnesota by Class members and/or purchases by Minnesota residents.

    a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Fragrance prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

    b) During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

    c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

981296.1

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. § 325D.51, *et seq.* Accordingly, members of the Damages Class seek all relief available under Minn. Stat. § 325D.51, *et seq.*

275. **Mississippi**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Miss. Code Ann. § 75-21-3, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Mississippi by Class members and/or purchases by Mississippi residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have bene injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code Ann. § 75-21-3, *et seq.* Accordingly, members of the Damages Class seek all relief available under Miss. Code Ann. § 75-21-3, *et seq.*

276. **Nebraska**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Neb. Rev. Stat. § 59-801, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Nebraska by Class members and/or purchases by Nebraska residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

981296.1

b) During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Accordingly, members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq.*

277. **Nevada**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Nev. Rev. Stat. Ann. § 598A.060, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Nevada by Class members and/or purchases by Nevada residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated through Nevada; (2) Fragrance prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free

and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b)  During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c)  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d)  By reason of the foregoing, Defendants members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

e)  During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

f)  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

g)  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.060, *et seq*. Accordingly, members of the Damages

Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.060, *et seq.*

278.  **New Hampshire**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.H. Rev. Stat. Ann. § 356.2, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in New Hampshire by Class members and/or purchases by New Hampshire residents.

a)  Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially throughout New Hampshire, (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b)  During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c)  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes § 356.2, *et seq*. Accordingly, members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:2, *et seq*.

279.   **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.M. Stat. Ann. § 57-1-1, *et seq*.** with respect to purchases of Fragrances and Fragrance Ingredients in New Mexico by Class members and/or purchases by New Mexico residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq.* Accordingly, members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

280.   **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.Y. Gen. Bus. L. § 340, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in New York by Class members and/or purchases by New York residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout New York; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances, or purchased products that were otherwise of lower quality than they would have been absent the conspirators illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

b) During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act § 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq.*

281.   **North Carolina**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.C. Gen. Stat. § 75-1, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in North Carolina by Class members and/or purchases by North Carolina residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Damages Class were

deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq.* Accordingly, members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et seq.*

282.   **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.D. Cent. Code § 51-08.1-01, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in North Dakota by Class members and/or purchases by North Dakota residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Fragrance prices were

raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*. Accordingly, members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

283.   **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Or. Rev. Stat. § 646.705, *et seq.,*** with respect to purchases of Fragrances and Fragrance Ingredients in Oregon by Class members and/or purchases by Oregon residents.

a) Defendants' combination and conspiracy had the following effects:
(1) Fragrance price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

284. **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **R.I. Gen. Laws § 6-36-4, *et seq*.** with respect to

purchases of Fragrances and Fragrance Ingredients in Rhode Island by Class members and/or purchases by Rhode Island residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Fragrance prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws § 6-36-4, *et seq*. Accordingly, members of the Damages Class seek all forms of relief available under R.I. Gen. Laws § 6-13.1-1, *et seq*.

981296.1

285.   **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **S.D. Codified Laws § 37-1,** *et seq.* with respect to purchases of Fragrances and Fragrance Ingredients in South Dakota by Class members and/or purchases by South Dakota residents.

a)   Defendants' combination or conspiracy had the following effects: (1) Fragrance price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Fragrance prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b)   During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

c)   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws § 37-1, *et seq.* Accordingly, members of the

Damages Class seek all relief available under South Dakota Codified Laws § 37-1, *et seq.*

286.  **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Tenn. Code Ann. § 47-25-101, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Tennessee by Class members and/or purchases by Tennessee residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrances price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Fragrances prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of

981296.1

trade in violation of Tennessee Code Ann. § 47-25-101, *et seq.* Accordingly, members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq.* Accordingly, members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

287.  **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Utah Code Ann. § 76-10-3101, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Utah by Class members and/or purchases by Utah residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrances price competition was restrained, suppressed, and eliminated throughout Utah; (2) Fragrances prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

141

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. § 76-10-3101, *et seq.* Accordingly, members of the Damages Class seek all relief available under Utah Code Ann. § 76-10-3101, *et seq.*

288.  **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Vt. Stat. Ann. tit. 9 § 2453, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients by Class members and/or purchases by Vermont residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrances price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Fragrances prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the

142

Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. tit. 9 § 2453, *et seq*. Accordingly, members of the Damages Class seek all relief available under Vermont Stat. Ann. tit. 9 § 2453, *et seq*.

289. **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **W. Va. Code § 47-18-4, *et seq*.** with respect to purchases of Fragrances and Fragrance Ingredients in West Virginia by Class members and/or purchases by West Virginia residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrances price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Fragrances prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq.*

290.   **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Wis. Stat. § 133.01, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Wisconsin by Class members and/or purchases by Wisconsin residents.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrances price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Fragrances prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Fragrances.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq.* Accordingly, members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq.*

## COUNT 3: VIOLATION OF STATE CONSUMER PROTECTION LAW
### (On Behalf of Plaintiffs and the Damages Class)

291.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

292.  During the Class Period, Defendants engaged in unfair or deceptive acts or practices in violation of the state deceptive trade practices and consumer protection laws pleaded below.

293.   **Arkansas:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Ark. Code Ann. § 4-88-107(a)(10)** with respect to purchases of Fragrances and Fragrance Ingredients in Arkansas by Class members and/or purchases by Arkansas residents.

    a)  Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

    b)  During the Class Period, Defendants' illegal conduct had a substantial effect on Arkansas commerce.

    c)  As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d)  By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Ark. Code Ann. § 4-88-107(a)(10). Accordingly, members of the Damages Class seek all relief available under Ark. Code Ann. § 4-88-107(a)(10).

294.   **California:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Cal. Bus. & Prof. Code § 17200, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in California by Class members and/or purchases by California residents.

a) Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on California commerce.

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. Accordingly, members of the Damages Class seek all relief available under Cal. Bus. & Prof. Code § 17200, *et seq*.

295. **Florida:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Fla. Stat. § 501.201(1),** *et seq.* with respect to purchases of Fragrances and Fragrance Ingredients in Florida by Class members and/or purchases by Florida residents.

a) Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Florida commerce.

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Fla. Stat. § 501.201(1), *et seq.* Accordingly, members of the Damages Class seek all relief available under Fla. Stat. § 501.201(1), *et seq.*

296. **Illinois:** Defendants have engaged in unfair or deceptive acts or practices in violation of **815 Ill. Comp. Stat. Ann. § 505/10a, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Illinois by Class members and/or purchases by Illinois residents.

a) Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Illinois commerce.

148

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of 815 Ill. Comp. Stat. Ann. § 505/10a, *et seq.* Accordingly, members of the Damages Class seek all relief available under 815 Ill. Comp. Stat. Ann. § 505/10a, *et seq.*

297. **Minnesota:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Minn. Stat. § 325F.68, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Minnesota by Class members and/or purchases by Minnesota residents.

a) Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Minnesota commerce.

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

149

981296.1

d)  By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Minn. Stat. § 325F.68, *et seq.* Accordingly, members of the Damages Class seek all relief available under Minn. Stat. § 325F.68, *et seq.*

298.   **New Mexico:** Defendants have engaged in unfair or deceptive acts or practices in violation of **N.M. Stat. Ann. § 57-12-3, *et seq*.** with respect to purchases of Fragrances and Fragrance Ingredients in New Mexico by Class members and/or purchases by New Mexico residents.

a)  Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

b)  During the Class Period, Defendants' illegal conduct had a substantial effect on New Mexico commerce.

c)  As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d)  By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of N.M. Stat. Ann. § 57-12-3, *et seq.* Accordingly, members of the Damages Class seek all relief available under N.M. Stat. Ann. § 57-12-3, *et seq.*

299.  **North Carolina:** Defendants have engaged in unfair or deceptive acts or practices in violation of **N.C. Gen. Stat. § 75-1.1,** *et seq.* with respect to purchases of Fragrances and Fragrance Ingredients in North Carolina by Class members and/or purchases by North Carolina residents.

a)  Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

b)  During the Class Period, Defendants' illegal conduct had a substantial effect on North Carolina commerce.

c)  As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d)  By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*. Accordingly, members of the Damages Class seek all relief available under N.C. Gen. Stat. § 75-1.1, *et seq*.

300.  **South Carolina:** Defendants have engaged in unfair or deceptive acts or practices in violation of **S.C. Code Ann. § 39-5-10,** *et seq.* with respect to purchases of Fragrances and Fragrance Ingredients in South Carolina by Class members and/or purchases by South Carolina residents.

151

a) Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of S.C. Code Ann. § 39-5-10, *et seq*. Accordingly, members of the Damages Class seek all relief available under S.C. Code Ann. § 39-5-10, *et seq.*

301. **Vermont:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Vt. Stat. Ann. tit. 9, § 2453, *et seq.*** with respect to purchases of Fragrances and Fragrance Ingredients in Vermont by Class members and/or purchases by Vermont residents.

a) Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Vt. Stat. Ann. tit. 9, § 2453, *et seq*. Accordingly, members of the Damages Class seek all relief available Vt. Stat. Ann. tit. 9, § 2453, *et seq.*

302. **Wisconsin:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Wisc. Stat. § 100.18, *et seq*.** with respect to purchases of Fragrances and Fragrance Ingredients in Wisconsin by Class members and/or purchases by Wisconsin residents.

a) Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

    c) As a direct and proximate cause of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Wisc. Stat. § 100.18, *et seq.* Accordingly, members of the Damages Class seek all relief available Wisc. Stat. § 100.18, *et seq.*

## COUNT 4: UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Damages Class)[211]

303.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

304.   To the extent required, this claim is pleaded in the alternative to the other claims in this Consolidated Complaint.

305.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Fragrances and Fragrance Ingredients.

---

[211] Unjust enrichment claims are alleged herein under the laws of the following States and territory: Arkansas, Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

981296.1

306.   Defendants have benefitted from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the Class Members for Fragrances and Fragrance Ingredients.

307.   Plaintiffs and the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the Damages Class Members are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

308.   Pursuit of any remedies against the firms from whom Plaintiffs and the Damages Class purchased Fragrances and Fragrance Ingredients subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes of all others similarly situated, respectfully request that the Court grant judgment against Defendants as follows:

A.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule

23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.   That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

  (a)   An unlawful combination, trust, agreement, understanding, and/or concert of action and an unreasonable restraint of trade or commerce in violation of the federal antitrust laws and state antitrust, unfair competition and consumer protection laws as set forth herein; and

  (b)   Acts of unjust enrichment by Defendants as set forth herein.

C.   Plaintiffs and Class Members recover damages to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and Class Members be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.   Plaintiffs and Class Members recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them,

be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.   Plaintiffs and Class Members be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.   Plaintiffs and Class Members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Consolidated Complaint;

H.   Plaintiffs and Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.   Plaintiffs and Class Members have such other and further relief as the case may require and the Court may deem just and proper.

981296.1

## XI.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

**LITE DEPALMA GREENBERG
& AFANADOR, LLC**

Dated:  February 5, 2024      */s/ Joseph J. DePalma*
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

**LITE DEPALMA GREENBERG
& AFANADOR, LLC**
Mindee J. Reuben
Steven J. Greenfogel
1515 Market Street - Suite 1200
Philadelphia, PA 19102
Tel: (267) 519-8306
MJR Direct Dial: (215) 704-2525
Fax: (973) 623-0858
mreuben@litedepalma.com
sgreenfogel@litedepalma.com

***Interim Liaison Counsel for
Producer Indirect Purchaser Plaintiffs***

158

**CUNEO, GILBERT & LADUCA, LLP**
Blaine Finley
Cody McCracken
4725 Wisconsin Ave., NW
Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
bfinley@cuneolaw.com
cmccracken@cuneolaw.com

**GUSTAFSON GLUEK PLLC**
Michelle J. Looby
Daniel E. Gustafson
Daniel C. Hedlund
Frances Mahoney Mosedale
Bailey Twyman-Metzger
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
mlooby@gustafsongluek.com
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
fmahoneymosedale@gustafsongluek.com
btwymanmetzger@gustafsongluek.com

**GUSTAFSON GLUEK PLLC**
Dennis J. Stewart
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 595-3299
Fax: (612) 339-6622
dstewart@gustafsongluek.com

***Interim Co-Lead Counsel for
Producer Indirect Purchaser Plaintiffs***

981296.1

**TOSTRUD LAW GROUP, P.C.**
Jon A. Tostrud
Anthony M. Carter
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Phone: 310-278-2600
Fax: 310-278-2640
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

**BOIESBATTIN LLP**
Timothy D. Battin
Christopher V. Le
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
tbattin@boiesbattin.com
cle@boiesbattin.com

*Interim Producer Indirect Purchaser Plaintiffs'*
*Steering Committee*

**ZIMMERMAN REED LLP**
David M. Cialkowski
June P. Hoidal
Ian F. McFarland
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Tel: (612) 341-0400
Fax: (612) 341-0844
david.cialkowski@zimmreed.com
june.hoidal@zimmreed.com
ian.mcfarland@zimmreed.com

*Attorneys for Producer Indirect Purchaser Plaintiffs*

981296.1