**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: FRAGRANCE DIRECT PURCHASER ANTITRUST LITIGATION | No. 2:23-cv-2174 |
| IN RE: FRAGRANCE INDIRECT PURCHASER ANTITRUST LITIGATION | No. 2:23-cv-3249 |
| IN RE: FRAGRANCE END-USER PLAINTIFF ANTITRUST LITIGATION | No. 2:23-cv-16127 |
| | **OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter comes before the Court on Defendants Firmenich SA, Firmenich Inc., and Agilex Flavors & Fragrances, Inc. (collectively, "Firmenich"); Givaudan SA, Givaudan Fragrances Corporation, Ungerer & Company, and Custom Essence LLC (collectively, "Givaudan"); Symrise AG, Symrise Inc., and Symrise US LLC (collectively, "Symrise"); and International Flavors & Fragrances Inc. ("IFF") (collectively, "Defendants")[1] motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) (the "Motion"), ECF No. 298.[2] The Court decides the Motion without oral argument. Fed. R. Civ. P. 78(b). For the reasons stated herein, the Motion is **DENIED**.

## I. BACKGROUND

The instant motion relates to three consolidated class action suits alleging, *inter alia*, violations of federal and state antitrust laws by Defendants, the four largest players in the global fragrance industry. Defendants previously moved to dismiss all three Complaints under Rule 12(b)(6), and the foreign Defendants moved to dismiss the Complaints under Rule 12(b)(2). The Court granted in part and denied in part the motion to dismiss under Rule 12(b)(6) and denied the motion to dismiss under Rule 12(b)(2). *In re Fragrance Direct Purchaser Antitrust Litig.*, No. 23-2174, 2025 WL 579639 (D.N.J. Feb. 21, 2025); *In re*

[1] IFF has since settled with all three Plaintiff classes. This Court has granted preliminary approval of the settlements in the Direct Purchaser and Indirect Purchaser suits, *In re Fragrance Direct Purchaser Antitrust Litig.*, No. 23-2174 ("DP Action"), ECF No. 281; *In re Fragrance Indirect Purchaser Antitrust Litig.*, No. 23-3249 ("IP Action"), ECF No. 232, and granted final approval as to the End-User Plaintiffs, *In re Fragrance End-User Plaintiff Antitrust Litig.*, No. 23-16127 ("EUP Action"), ECF No. 274. Firmenich has also settled with the Direct Purchaser Plaintiffs, with preliminary approval of the settlement granted. DP Action, ECF No. 311.

[2] Unless otherwise noted, all ECF citations refer to the DP Action docket.

*Fragrance Direct Purchaser Antitrust Litig.*, No. 23-2174, 2025 WL 572827 (D.N.J. Feb. 21, 2025).

The Court briefly describes the relevant factual allegations below, which are accepted as true for the purposes of this Motion, and otherwise incorporates the statement of facts found in the Court's prior opinion on Defendants' Rule 12(b)(6) motion. *See Fragrance*, 2025 WL 579639, at *2–7.

**A. Factual Background**

Three separate putative class actions were formed, each representing a different class of plaintiffs—Direct Purchasers, Indirect Purchasers, and End-Users.[3] Direct Purchasers are companies who buy fragrance products directly from the Defendants. Indirect Purchasers are individuals and companies who purchase products produced by the Defendants from other sellers. End-User Plaintiffs are individuals who purchase consumer goods containing the products produced by the Defendants.

Defendants are the world's four largest producers of fragrance ingredients and compounds, together owning roughly two-thirds of the global and U.S. markets. DC ¶ 70; IC ¶ 116; EC ¶ 124. Fragrance manufacturers like Defendants operate in the middle of the fragrance industry supply chain. They acquire natural and synthetic raw materials from upstream suppliers and use those materials to create fragrance products, which are then sold to companies who produce finished consumer products. DC ¶ 39; IC ¶ 75; EC ¶ 95. Defendants create and sell two types of fragrance products—ingredients and compounds. Individual fragrance ingredients are combined to create fragrance compounds. DC ¶ 50; IC ¶ 86; EC ¶ 104. Defendants use fragrance ingredients to create their own compounds and sell fragrance ingredients to product manufacturers and other compound makers. DC ¶ 49; IC ¶ 85; EC ¶ 103. Notably for purposes of this Motion, this means that Defendants sell fragrance ingredients to each other for use in their own compounds. DC ¶ 49; IC ¶ 85; EC ¶ 103. Ultimately, the fragrance products (typically oils or powders) are sold to companies who add them to consumer goods (such as candles, soaps, cleaning products, and perfumes).

According to the Plaintiffs, beginning "at least as early as January 1, 2018," Defendants entered into a conspiracy to fix prices for fragrance ingredients and compounds. DC ¶ 105; IC ¶ 153; EC ¶ 159. Following a period of steady decline in the cost of fragrance products, Defendants initiated a series of parallel price increases that dramatically increased the price of fragrance products in the United States by over 37%. DC ¶¶ 106–108; IC ¶¶ 154–156; EC ¶¶ 160–163. Defendants assured each other that "they would not compete for business on price," and sold excess fragrance ingredients between one another to "enforce and monitor" the conspiracy. DC ¶¶ 67, 107; IC ¶¶ 113, 155; EC ¶¶ 121, 162.

---

[3] For ease of reference, the Court adopts the same shorthand for citation to the three complaints as it did in its previous decisions: the Direct Purchaser Complaint is referred to as the "DC"; the Indirect Purchaser Complaint is referred to as the "IC"; and the End-User Plaintiff Complaint is referred to as the "EC."

**B. Procedural History**

As discussed above, Defendants previously moved to dismiss the complaints under Rule 12(b)(6) and Rule 12(b)(2). The Court denied the motions as related to the Sherman Act and state antitrust claims, finding that Plaintiffs had adequately pled a conspiracy to fix prices in violation of the Sherman Act and state antitrust laws.

On July 7, 2026, Defendants filed the instant Motion, seeking judgment on the pleadings under Rule 12(c). Defendants argue that the allegations do not state a claim under the *per se* rule due to the Defendants' complex, multi-level relationships. Plaintiffs filed an opposition brief on August 7, 2026. ECF No. 317. Defendants filed a reply on August 21, 2026. ECF No. 331.

The United States of America filed a Statement of Interest pursuant to 28 U.S.C. § 517 on October 10, 2026. ECF No. 349. The Statement of Interest addressed only legal arguments advanced in the Motion regarding the applicability of the *per se* rule and did not take a position on other arguments or factual assertions. Defendants filed a reply to the Statement of Interest on October 23, 2026. ECF No. 355.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion for failure to state a claim upon which relief can be granted is analyzed under the same standards as a Rule 12(b)(6) motion. *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017). As with a Rule 12(b)(6) motion, under a Rule 12(c) motion the moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). The Court must accept as true all facts stated in the complaint and draw all reasonable inferences in favor of the non-moving party. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). To survive a Rule 12(c) motion, the factual allegations must "state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007).

## III. DISCUSSION

Defendants' argument centers around the applicability of the *per se* rule given the existence of inter-Defendant sales within the alleged price-fixing scheme. Generally, Defendants argue that Plaintiffs' antitrust claims should be classified as a hybrid relationship analyzed under the rule of reason, as opposed to a horizontal restraint subject to the *per se* rule.

**A. Relevant Antitrust Principles**

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce. . . ." 15 U.S.C. § 1.[4] Courts have since recognized that § 1 prohibits only unreasonable restraints on competition. *Texaco Inc. v. Dagher*, 547 U.S. 1,

---

[4] In addition to Section 1 of the Sherman Act, Direct Purchaser and Indirect Purchaser Plaintiffs allege a violation of Section 3. Section 3 of the Sherman Act is virtually identical to Section 1 and is analyzed under the same standards as Section 1. *Robinson v. Jackson Hewitt, Inc.*, No. 19-9066, 2019 WL 5617512, at *5 n.7 (D.N.J. Oct. 31, 2019).

5 (2006); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir. 2004). To determine whether a restraint is unreasonable, courts typically engage in an analysis under one of three tests—the rule of reason, the *per se* rule, or the quick-look approach.

The rule of reason imposes a three-step, burden-shifting framework to determine if a restraint is reasonable. The initial burden is on the plaintiff to prove that a "challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). This is a heavy burden. If the plaintiff does carry this burden, Defendants are able to provide procompetitive reasons for the restraint. *See Eichorn v. AT&T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001).

The *per se* rule sits on the opposite end of the spectrum. Certain categories of restraints are deemed *per se* illegal and inherently unreasonable. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 89 (2021). This treatment is reserved only for those restraints that are "so plainly anticompetitive" and which courts have considerable experience with. *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Such restraints include, notably, horizontal agreements to fix prices. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940); *Dagher*, 547 U.S. at 5 ("Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful.").

The quick-look approach is an intermediate standard, developed as a middle-ground alternative to the two traditional analyses. The quick-look is an abbreviated rule of reason analysis, where the restraint is not of a type demanding *per se* condemnation, but does not require a full market analysis to determine its anticompetitive effect. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

**B. Categorizing the Restraint**

The question facing this Court is whether the alleged restraint is subject to the *per se* rule or should be analyzed under the rule of reason.

Defendants portray the alleged conspiracy as a complicated arrangement consisting of intertwined horizontal and vertical aspects. Because Defendants both compete in the sale of fragrance products to downstream third parties and purchase fragrance products from each other, Defendants assert that the restraint cannot be categorized as purely horizontal. The Court disagrees.

Horizontal price-fixing is the quintessential restraint subject to *per se* treatment under Section 1 of the Sherman Act. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *Dagher*, 547 U.S. at 5. Horizontal price-fixing occurs "when competitors on the same market level agree to fix or control prices for their goods." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 395 n.7 (3d Cir. 2015). Conversely, agreements between entities at different levels of a market, such as between a manufacturer and a distributor, are deemed to be vertical restraints analyzed under the rule of reason. *See Leegin*, 551 U.S. at 907.

Some scenarios implicate both horizontal and vertical restraints, which courts have labelled 'hybrid' relationships. *See Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 210–11 (3d Cir. 2008); *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 439 (3d Cir. 2023). Hybrid arrangements can be subject to any of the three approaches, subject to a fact-specific inquiry. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010). Common hybrid arrangements are hub-and-spoke conspiracies, where horizontally situated parties enter into identical arrangements with a single middle-man, and dual-distributor arrangements, where a manufacturer both supplies a distributor and competes directly at the distribution level. *See id.* (detailing a hub-and-spoke conspiracy); *see also AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) (detailing a dual-distributor arrangement).

Defendants rely heavily on the Third Circuit's opinion in *Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative, Inc.* to support the argument that Plaintiffs have alleged a hybrid conspiracy and not a horizontal conspiracy, and such a hybrid conspiracy should be subject to rule of reason analysis. In *Winn-Dixie*, a group of mushroom growers formed a cooperative in order to establish a set of standardized price lists for their mushrooms. 89 F.4th 430. The minimum price lists served to dictate the prices at which downstream distributors sold the mushrooms, not the prices at which the growers sold the product to those distributors. Many of the cooperative members had exclusive relationships with downstream distributors, which were often legally related to the grower, while other members operated only as growers without any relationship with a particular distributor. The Court described the alleged conspiracy as "an agreement by [cooperative] members to encourage vertically oriented distributors—some of which were integrated with [cooperative] members and some of which were not—to charge retailers at least the [cooperative] rate." *Id.* at 435–36.

The Court in *Winn-Dixie* held that the allegations described "a collective effort among upstream farmers and downstream distributors, each of whom were vertically integrated to differing degrees." *Id.* at 440. Because the conspiracy had interplay between horizontal and vertical components, it was deemed a hybrid scheme and the rule of reason applied. *Id.* at 441. Notably, the Court highlighted that the "scheme consisted of a 'horizontal agreement among competitors (growers) to fix prices *at a different level of distribution*.'" *Id.* (emphasis in original) (citation omitted).

Here, Plaintiffs have alleged a conspiracy far more akin to a traditional horizontal price-fixing scheme than the hybrid arrangement found in *Winn-Dixie*. The orientation of a conspiracy turns on the nature of the agreement and the restraint imposed. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (2023) ("[A] restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement."); *see also Winn-Dixie*, 89 F.4th at 440 (holding that the application of the *per se* rule "boils down to whether we have 'amassed considerable experience with the *type of restraint* at issue'") (emphasis added) (citing *Alston*, 594 U.S. at 89).

Whether the alleged conduct should be assessed under the *per se* rule or the rule of reason depends only on the plaintiff's factual assertions, not on the labels utilized in the complaint or the parties' characterizations. *Animal Sci. Prods., Inc. v. China Nat'l Metals & Mins. Imp. & Exp. Corp.*, 596 F. Supp. 2d 842, 848 (D.N.J. 2008).

Plaintiffs allege a conspiracy among Defendants to restrict competition on price. DC ¶ 105; IC ¶ 153; EC ¶ 159. The restraint was imposed on competition at one level, the middle level at which Defendants sold fragrance products.[5] Unlike in *Winn-Dixie*, the present conspiracy did not rely on actors at different levels of the market to participate. The mere fact that Defendants purchased products from one another does not transform the restraint or add an additional vertical aspect. Plaintiffs allege that the inter-Defendant sales served as a way for the conspirators to "enforce and monitor" the conspiracy. DC ¶¶ 67, 107; IC ¶¶ 113, 155; EC ¶¶ 121, 162. There are no allegations to support the conclusion that there was a vertical agreement with downstream distributors. Defendants agreed to restrict competition among themselves, horizontal competitors. The existence of some inter-Defendant sales does not shift the Defendants down a level in the market. While Defendants describe the conspiracy as containing complex, intertwined vertical and horizontal aspects, merely labelling an arrangement as hybrid does not make it so. *See United States v. Brown Univ.*, 5 F.3d 658, 670 (3d Cir. 1993) ("[T]he test for determining what constitutes *per se* unlawful price-fixing is one of substance, not semantics."). Likewise, simply pointing to the existence of some vertical relationship between Defendants does not turn the restraint vertical.

As the applicability of the *per se* rule depends on the restraint's classification, the inquiry turns on the nature of the restraint imposed and not on the existence of a vertical relationship between Defendants. Because the alleged restraint here concerns the price of fragrance products sold by Defendants to purchasers, without requiring any action from a different level of the market, it falls into the well-established *per se* bucket of horizontal price-fixing where competitors restrict price competition with each other at the same market level. *See Flat Glass*, 385 F.3d at 356. Appropriately analyzed under the *per se* rule, the Court finds that Plaintiffs have plausibly stated a claim for relief under the Sherman Act.

Defendants also argue that judgment on the pleadings should be granted as to the state antitrust law claims, which are analyzed under the same standards as the Sherman Act claims. Mot. at 13. Because the Court has held that Plaintiffs' Sherman Act claims survive

---

[5] Plaintiffs do not allege, and Defendants do not claim, that Defendants also act as product manufacturers operating at an additional level of the market. Because, according to Plaintiffs' allegations, Defendants exist and operate at the same level of the market, the agreement amongst them is properly considered purely horizontal. This fact distinguishes the present case from others in which entities operate at two distinct levels of the market, also known as dual-distribution arrangements, where courts have recognized both horizontal and vertical aspects to such an arrangement and deemed them not automatically subject to the *per se* rule. *See, e.g.*, *Black Box Corp. v. Avaya, Inc.*, No. 07-6161, 2008 WL 4117844 (D.N.J. Aug. 29, 2008); *AT&T Corp.*, 470 F.3d at 531 (3d Cir. 2006).

the Motion, this argument fails. The Court finds that Plaintiffs have plausibly stated a claim for relief under the remaining state antitrust law claims.

## IV. CONCLUSION

For these reasons, the Motion is **DENIED**. An appropriate order follows.

Date: November 9, 2026

WILLIAM J. MARTINI, U.S.D.J.